**McDONNELL DOUGLAS CORPORA-
TION and General Dynamics
Corporation, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 91–1204C.

United States Court of Federal Claims.

March 30, 1998.

Caryl A. Potter, III, Elizabeth A. Ferrell, and Roger K. Heidenreich, Sonnenschein Nath & Rosenthal, Washington, D.C. and St. Louis, Missouri, for plaintiff McDonnell Douglas Corporation, with whom was John W. Walbran, McDonnell Douglas Corporation, of counsel; Herbert L. Fenster, David A. Churchill, McKenna & Cuneo, Washington, D.C., for plaintiff General Dynamics Corporation.

Bryant G. Snee, United States Department of Justice, Washington, D.C., for defendant, with whom was George P. Williams, Office of the General Counsel, Department of the Navy, of counsel.

## OPINION AND ORDER

HODGES, Judge.

### INTRODUCTION

Plaintiffs McDonnell Douglas and General Dynamics entered into a full-scale engineering and development (FSED) contract with the Navy in 1988 to develop the A–12, a Stealth aircraft. The Navy terminated the contract for default in 1991. We ruled that the termination for default was improper and converted it into a termination for the convenience of the Government. *See McDonnell Douglas Corp. v. United States*, 35 Fed.Cl. 358 (1996). The purpose of this opinion is to set forth our reasons for awarding plaintiffs most of the costs that they incurred in performing the A–12 contract.

### BACKGROUND

"[I]f, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government." Federal Acquisition Regulation (FAR) 52.249–9(g). We approach this situation as if the Government had terminated this contract for convenience on January 7, 1991—the date of the default termination.[1]

---

1. FAR 52.249–9(g) is a fiction that has not operated smoothly in this case. A contracting officer who has just terminated a contractor for default is not interested in considering the same contractor's claim for termination for convenience settlement costs. Nor is the contracting officer

■ Plaintiffs argued that the FAR entitles them to incurred costs plus a reasonable profit, while defendant urged us to adjust plaintiffs' cost reimbursement amount downward to reflect the loss that they would have sustained had the contract been completed. When the Government terminates a contract for its convenience, the contractor "should be compensated fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable amount for profit." FAR 49.201. Typically, the contractor is entitled to recover all of its incurred costs and settlement costs, and reasonable profits if warranted. *See* FAR 52.249–2(f). If it appears that the contractor would have suffered a loss on the entire contract, however, the contractor would not obtain a profit, and its cost recovery is reduced according to the rate of loss. *See id; see also McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 270, 272–73 (1996). For reasons stated in a December 1996 ruling, however, we did not allow profit or consider to what extent a loss ratio might apply. *See McDonnell Douglas Corp.,* 37 Fed.Cl. at 272. We could not consider plaintiffs' Requests for Equitable Adjustment for similar reasons. *See Id.* at 272. During trial in June and July 1997, we considered only the costs plaintiffs incurred by performing the A–12 FSED contract, Lots I, and II options, and "wind-up" termination costs.

Plaintiffs presented a termination for convenience claim for $3.992 billion, excluding profit and interest and before application of the "funding cap."[2] The $3.992 billion in costs include: $3.750 billion for the FSED portion of the contract, $.212 billion for Lot I, and $.030 billion for Lot II.[3] Plaintiffs submitted their certified termination for convenience claim on a total cost basis in June 1991. Later updates covered costs incurred in the interim, such as subcontractor settlements.

The funding cap imposed by the court limits recovery to $3,499,793,515 for the FSED portion of the contract. Additional funds obligated through the Incentive Price Revision and Economic Price Adjustment clauses raise the funding cap to $3,635,767,-376. Adding to this amount the $.212 billion for Lot I and $.030 billion for Lot II, which are undisputed amounts "outside" of the cap, we arrive at $3,877,767,376, the highest award possible with the funding cap in place. Unless the Government's valid challenges would bring the amount claimed by plaintiffs below this figure, findings detailed below have little practical effect.

The parties asked us to determine plaintiffs' total incurred costs, irrespective of the cap. If the funding cap is higher or does not apply, plaintiffs' reasonable, allowable, and

likely to participate in subcontractor settlements as provided by FAR 49.108–7 ("Government assistance in settling subcontracts"), if he assumes that the contractors will be responsible for all of the subcontractor settlements. That is what happened here. The contracting officer declined to participate in the contractors' settlement discussions with subcontractors, thereby giving plaintiffs an "estoppel" argument on that issue. We did not address estoppel, but ruled that the settlements presumptively were appropriate if the Government could not show collusion or less than arms-length bargaining.

2. We determined that the incremental funding clause (H–7) of the contract limits plaintiffs' cost recovery to the funds obligated at the time of termination: $3,499,793,515. *See McDonnell Douglas Corp. v. United States,* 37 Fed.Cl. 295, 297 (1997), *modified,* 39 Fed.Cl. 665 (1997). When adjusted for funding obligated for Incentive Price Revisions and Economic Price Adjustments (IPR/EPA), the total funding cap is $3,635,767,376. *See McDonnell Douglas Corp. v. United States,* 39 Fed.Cl. 665, 672–73 (1997) (finding that additional funding was obligated to

cover approximately $135 million pursuant to an Economic Price Adjustment Clause and an Incentive Price Revision Clause.) Lots I and II were separate provisions in the A–12 contract that were not governed by the incremental funding clause. Recovery under Lots I and II is not in dispute. *See McDonnell Douglas Corp.,* 37 Fed.Cl. at 297 n. 2.

3. Under the contract, plaintiffs were to produce eight FSED aircraft. The contract also provided the Navy an option to purchase four production lots of aircraft. Each FSED aircraft would test different characteristics of the A–12; stealth capabilities would be verified in the "fully capable, fully equipped" eighth aircraft that would serve as the basis for the production lots. Under the original agreement, the first FSED aircraft would be delivered in June 1990; the rest would be delivered monthly through January 1991. The Navy exercised its option on the first production lot on May 31, 1990. *See McDonnell Douglas Corp.,* 35 Fed.Cl. 358, 362 (1996).

allocable costs total $3,978,002,676. Otherwise, plaintiffs may recover no more than $3,877,767,376.

### Problems with the Coopers & Lybrand (Miller) Report

The Government hired Coopers & Lybrand to audit plaintiffs' incurred costs. This effort was managed by Frederic R. Miller, an auditor who was the Government's only witness at trial.

The Government's challenges to plaintiffs' claimed costs are based entirely upon the Miller Report. Plaintiffs supplied proof with respect to all of their claimed costs to some degree, but more in some areas than in others. Some of these costs could not be awarded if strict accounting standards were employed. We believe that the FAR does not limit such costs to a rigid application of cost accounting standards.

Plaintiffs attacked Mr. Miller's experience and credibility along with the usefulness of his report. General Dynamics contended that Miller had no personal knowledge and experience with the program. He was "denied access to the very government personnel who were familiar with it," such as the program manager, contracting officer and class desk. Additionally,

> Miller had no experience working for an aircraft design company and no prior experience with an RDT & E program that had been terminated. Miller had only a general sense of what the A–12 contract required; he did not have the necessary security clearances to know what it specifically required. Miller lacked familiarity with the requirements, schedule, and terminology of the A–12 research and development contract, including such issues as concept formulation, DEM/VAL, IDR, PDR, CDR, concurrency, how many radars were required, how many test aircraft were required, how many change orders occurred, when first flight was, and when and how the contract schedule changed. Despite this inexperience, [Coopers & Lybrand] consulted with no one in the Navy who had been involved with the A–12 program for technical assistance—not Cap-

tain Elberfeld, not Captain Cook, not Mr. Mutty, and not Admiral Morris. Miller conceded that such information could be competent evidence for an auditor to consider, but observed that he did not have access to such people.... Indeed, the government instructed C & L not to consult with such Navy personnel.

Plaintiffs' problems with Miller's report do not stop there. General Dynamics questions, *inter alia*, Miller's level of experience/familiarity with the "25% rule" that applies to items being returned to vendors for restocking, Inventory Verification Reports, and plant clearance officers. According to General Dynamics, Miller "did not consider relevant FAR and DCAA Contract Audit Manual ... provisions before questioning plaintiffs' post-termination relocation expenses."

Miller's report claims to represent the "independent and objective opinions of [Coopers & Lybrand] regarding plaintiffs' termination for convenience claim." Plaintiffs question this assessment.[4] General Dynamics observes that "[d]uring the drafting of the May 1995 reports, Miller consulted with, and received comments from the Department of Justice in order, in Miller's words, 'to make sure we were all singing from the same sheet of music in terms of the final report.'"

Mr. Miller's analysis was helpful but marginally useful in determining the proper level of incurred costs. He acknowledged that the audit involved making determinations that were "straight up and down accounting type of decisions.... We viewed our role as providing ... only an audit report that was advisory ... in nature, and that we wouldn't be making ultimate determinations that either the TCO or the person sitting in the place of the TCO would have to make." Defendant's counsel confirmed, "Miller has not been offered to provide opinions under [FAR] 49.201.... Mr. Miller is here to testify and we're offering him to testify regarding his conclusions as to allowability, allocability and reasonableness under FAR part 31." Miller understood that his role was to provide accounting advice and his opinion

---

4. A note contained in the auditors' workpapers states the following: "Limit the positive comments (actually none), we want 'negatives.' What is wrong with the proposal."

regarding FAR Part 31, but that the court's inquiry must include a consideration of FAR Part 49 as well.

### Tension Between FAR Part 31 and FAR Part 49

■ Defendant argued that FAR Part 31 should be the focal point of the court's analysis; plaintiffs emphasized FAR Part 49. FAR 49.113 provides that "[t]he cost principles and procedures in the applicable subpart of Part 31 shall, *subject to the general principles in 49.201,* . . . be used." (emphasis added). *See also Codex Corp. v. United States,* 226 Ct.Cl. 693, 698–99, 1981 WL 27970 (1981). Part 31 generally may be described as establishing a formulaic, accounting-based structure, while Part 49 provides an equity-based framework. Because Part 31 is subject to the general principles of 49.201, we do not apply strict cost accounting principles here. "The use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement." FAR 49.201(a). We cannot ignore equitable considerations and reasonable business judgment in our deliberations.[5]

■ Still, plaintiffs bear the burden of proving their termination for convenience damages. *See Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 767 (Fed.Cir. 1987); FAR 31.201–3(a); *see also Bath Iron Works Corp. v. United States,* 34 Fed.Cl. 218, 231 (1995), *aff'd,* 98 F.3d 1357 (Fed.Cir.1996). The costs considered in a termination for convenience recovery must also satisfy the general requirements of FAR Part 31—that the costs be reasonable, allowable and allocable. *See* FAR 49.113; *see also* FAR 31.201–2 to 31.201–4 (outlining the requirements of allowability, reasonableness, allocability, respectively); 31.205–42 (providing cost principles "peculiar" to termination situations).

### Overall Lack of Evidence that Plaintiffs "Padded" their Costs

Defendant had little evidence that plaintiffs attempted to inflate their costs. One would expect to find some improper charges claimed through inadvertence or negligence, if nothing else. But generally we were not provided with evidence of inflated costs claims through bad faith, negligence, or otherwise.[6] Most of plaintiffs' costs were incurred during a time when they had no reason to think that the costs would be reimbursed.

This opinion will show that for the most part, we found no basis for questioning the reasonableness, allowability, or allocability of plaintiffs' claimed costs.

### *DISCUSSION*

#### I.

### SUBCONTRACTOR SETTLEMENTS

FAR 49.104 provides, in pertinent part:

After receipt of the notice of termination, the contractor shall comply with the notice and the termination clause of the contract, except as otherwise directed by the TCO. The notice and clause applicable to convenience terminations generally require that the contractor—

. . . .

(g) Settle outstanding liabilities and proposals arising out of termination of subcontracts, obtaining any approvals or ratifications required by the TCO . . . .

"Contractors shall settle with subcontractors in general conformity with the policies and principles relating to settlement of prime contracts in this subpart and subparts 49.2 or 49.3." FAR 49.108–3(a). "The use of busi-

---

5. At the same time, we cannot fault Mr. Miller's emphasis on FAR Part 31. He is a cost accountant, and he carried out the mission that he was given. He did not have the access that he needed, and he was not provided other necessary tools as plaintiffs generally claim.

6. As General Dynamics argues in its post-trial brief:

"The fixed-price nature of the contract provided the contractors with a financial incentive during performance to incur only necessary costs, and to control strictly the amount of those costs. . . . And, because the contract was terminated for default, the contractors were liable, with no assurance of being reimbursed, for all the amounts they incurred after termination, including all of the amounts they paid to settle with their subcontractors."

Testimony at trial supported this argument.

ness judgment, as distinguished from strict accounting principles, is the heart of a settlement." FAR 49.201(a). "The primary objective is to negotiate a settlement by agreement." FAR 49.201(b). "In appropriate cases, costs may be estimated, differences compromised, and doubtful questions settled by agreement." FAR 49.201(c).

Prime contractors must terminate all subcontracts related to the terminated portion of the prime contract and settle all liabilities and proposals arising out of termination of the subcontracts. FAR 49.104(b), (g). The A–12 contract entitles the contractors to the cost of settling and paying subcontractor termination proposals. FAR 52.249–2(f)(2)(ii). Such costs are "generally allowable." FAR 31.205–42(h); FAR 31.205–42(g)(1)(i)(B).

FAR 49.201 requires that the contractor be compensated fairly through the exercise of judgment. Cost and accounting data may be employed but are not rigid measures for determining fair compensation. Settlements may be executed on a "bottom line" basis. *See* FAR 49.201(b) ("The parties may agree upon a total amount to be paid the contractor without agreeing on or segregating the particular elements of costs or profit comprising this amount").

 Contractors are entitled to the costs of subcontractor settlements provided the settlements are "arrived at in good faith, ... reasonable in amount, and ... allocable to the terminated portion of the contract." FAR 49.108–3(c). A settlement will be approved when it is the product of "arms-length bargaining, without collusion, and reflect[s] a sound exercise of prudent business judgment" by the prime contractor. *General Electric Co.*, ASBCA No. 24111, 82–1 BCA ¶ 15,725 at 77,806, 1982 WL 7083 (March 29, 1982), *aff'd on recon.*, ASBCA No. 24111, 83–1 BCA ¶ 16,207, at 80,529, 1982 WL 7993 (December 1, 1982). The FAR does not encourage second-guessing of the exercise of business judgment. *Id.* at 77,804.

 Subcontractor settlements may comprise the subcontractor's incurred costs, profit or loss adjustment, and the subcontractor's settlement expenses. If the sum is reasonable, allocable, and allowable, the subcontractor is entitled to recovery.

We ruled that defendant could not question plaintiffs' business judgment or negotiating tactics, but that it could submit evidence of investment, bad-faith, self-dealing, or less than arms-length transactions. Defendant also could show evidence of willful neglect or wrongdoing attributable to the plaintiffs, if applicable.

### A. Norden

Norden had a subcontract with General Dynamics to provide a radar system for the A–12. General Dynamics terminated Norden for default in April 1989, and Norden sued General Dynamics in June 1989. The parties settled this litigation in 1992 for approximately $40 million. As part of its termination settlement proposal to the Government, General Dynamics claimed the $40 million amount of settlement, $10 million in legal fees incurred in its defense, and $10.7 million in reprocurement costs.

We ruled in August 1997 that General Dynamics' decision to settle with Norden was made on the basis of sound business judgment. The Government argued that General Dynamics could not recover costs associated with the Norden settlement because it terminated Norden for default. Testimony at trial established that (1) General Dynamics faced a potential liability of $160 million; (2) a trial would have been litigated before a jury in Norden's home state of Connecticut; (3) security problems would have made trial dangerous and perhaps restrictive; and (4) Norden could have raised General Dynamics' own schedule slippage in its defense. General Dynamics determined that it was prudent to settle with Norden, and we declined to second-guess that reasoned decision. *See generally Nolan Brothers, Inc. v. United States*, 194 Ct.Cl. 1, 437 F.2d 1371, 1392 (1971) (holding that costs incurred as a result of a decision to terminate a subcontractor for default were recoverable so long as the decision was "one that a prudent business man would take in the circumstances").

### B. Westinghouse

Westinghouse subcontracted with General Dynamics in 1988 to develop and supply the

538

combined-function forward-looking infrared radar system for the A–12 aircraft. As a result of the Norden termination in 1989, the subcontract was superseded by a new subcontract requiring Westinghouse to develop and supply the multi-function radar systems also. Westinghouse began work on the new contract late in the development phase of the project. *See McDonnell Douglas Corp. v. United States,* No. 91–1204, 1997 WL 842408 (Fed.Cl. Aug. 21, 1997). The Government terminated the prime contract in January 1991, and General Dynamics terminated Westinghouse in April 1991. Westinghouse submitted a termination settlement proposal and request for equitable adjustment in May. The parties negotiated a $73 million settlement in August 1991. The Government challenges $51,099,249 of that settlement.[7]

### 1. Expedited Settlement

■ The Government argues that Westinghouse and General Dynamics colluded or engaged in less than arms-length dealing because of circumstances surrounding their settlement. That is, General Dynamics departed from its internal procedures and settled with Westinghouse on an expedited basis before an audit and claims analysis was performed. Defendant suspects that General Dynamics expedited settlement so that it could enlist Westinghouse's support in this litigation.

The Westinghouse settlement was allocable, allowable, and reasonable. That the settlement was achieved on an expedited basis does not taint its integrity. Settlement was made contingent upon a successful audit. General Dynamics settled with Westinghouse long before the prime contract termination was converted into one for convenience, and it faced severe litigation risk. General Dynamics had no incentive to settle with Westinghouse on a less than reasonable basis. Westinghouse sought $110 million; the parties settled for $73 million.

### 2. Combined Loss Ratio

Defendant challenges $27,573,468 due to an alleged improper calculation of Westinghouse's loss ratio. The loss ratio is impermissible, according to defendant, because unlike those applied to other subcontractor settlements, the loss ratio applied to Westinghouse combined FSED, Lot I, and Lot II. This had the effect of increasing Westinghouse's recovery and the Government's ultimate liability by $27,573,468. "The impact of combining the loss ratio is to dilute the impact [of] the loss ratio on the FSED portion of the contract which represented 82% of the actual costs at termination," defendant argues.

■ General Dynamics states that it imposed a combined loss ratio here because the subcontract required it. Westinghouse subcontracted with General Dynamics initially to supply the combined-function forward-looking radar system only. After General Dynamics terminated Norden, its initial subcontractor, however, it assigned Westinghouse the additional responsibility of developing and supplying the multi-function radar system. In return for accepting the multi-function radar duties late in the development phase, Westinghouse demanded that any loss ratio imposed combine FSED, Lot I, and Lot II. Motorola was the only other subcontractor to extract such a concession. General Dynamics did not impose a combined loss ratio on Motorola because Motorola was not in a loss position at the time of termination.

Loss ratios were segregated for purposes of progress payments for more than a year after General Dynamics and Westinghouse renegotiated the subcontract, but Westinghouse insisted that they be integrated. General Dynamics' legal department agreed, and sought and obtained Government approval. The Government argues that it approved the combined loss ratio for progress payments only, not for final settlement. We are not aware that Government approval is required in such circumstances. Moreover, there is no prohibition against combining loss ratios. The application of a combined loss ratio to the Westinghouse subcontract does not demonstrate collusion or less than arms-length

7. The Government challenged costs as either "questioned" or "pending." Questioned costs are considered by defendant not to be reasonable, allowable, or allocable. Costs are designated "pending" because the Government's audit team claims it did not have enough information about them to make an evaluation. We reviewed all challenged costs on the same basis.

dealing. General Dynamics believed that it was required to combine FSED, Lot I, and Lot II for purposes of assessing any loss ratios, and that position was not unreasonable. The contract does not limit the application of a combined loss ratio to progress payments only.

Moreover, Westinghouse demanded that loss ratios be combined as consideration for agreeing to perform the multi-function radar contract late in the program. The first subcontractor, Norden, was terminated more than a year into contract performance in 1989. Westinghouse's performance period was compressed. General Dynamics needed exceptional performance from Westinghouse, and got it. It was reasonable for General Dynamics to agree to a combined loss ratio.

### 3. Low Range Estimate at Completion Value

■ General Dynamics engineers generated a range of estimate at completion (EAC) values that settlement negotiators could employ to compute the loss ratio for the Westinghouse settlement. The values ranged from low to high and General Dynamics used a low value at settlement. Specifically, General Dynamics' engineers recommended a range of possible EACs from $163 million to $175 million. The negotiators actually used an EAC of $165.8 million. The Government contends that they should have used an EAC at the mid-point of the range. This would have increased the loss adjustment and reduced the Government's liability by $3,602,687. It was unreasonable for the contractor to select a lesser EAC value within the estimated range, according to the Government.

General Dynamics derived the estimate at completion from a reasonable exercise of business judgment and consideration of other information in addition to engineering analysis. It weighed competing considerations and input from financial and business personnel. This exercise resulted in the departure from a mid-point in the estimated range.

That General Dynamics' negotiators employed a value from the low end of the range does not invalidate it. The FAR expressly permits a contractor to employ business judgment in reaching a settlement with the subcontractor. *See* FAR 49.201(a). Engineering was only one source of information that General Dynamics considered before selecting its EAC; it consulted business and financial personnel, and weighed competing considerations. This is the essence of the exercise of business judgment.

The Government's solution—arbitrarily to choose the mid-point of the engineering department's range—is not consistent with the exercise of business judgment. We find no support for the position that it is *per se* unreasonable for a contractor to select a value that is below the mid-point of an estimated EAC range.

### 4. Profit on Lots I and II

General Dynamics applied a loss ratio of 84.87% on Lot I progress payments prior to terminating Westinghouse. Lot II progress payments were suspended in December 1990. Defendant questions certain costs because General Dynamics settled with Westinghouse allegedly on the basis of 15–20% profit margins. Defendant challenges $9,397,228 because it appears that General Dynamics credited Westinghouse with profit for Lots I and II while the contract was in a loss position. The Government argues that it was improper to pay Westinghouse profit. General Dynamics denies that it paid Westinghouse profit, but that instead it applied a combined loss ratio of 85.73% to the Westinghouse contract.

If the loss ratio is segregated, it may appear that Westinghouse received profit for Lots I and II. We stated that it was reasonable for General Dynamics to combine loss ratios in the circumstances of this case, however. The combined loss ratio precluded Westinghouse from making profits. The Government's argument assumes that General Dynamics was required to segregate loss ratios, but the contract did not require segregation.

### 5. Inventory Transfer

Upon termination of its sub-contract with General Dynamics, Westinghouse transferred inventory originally slated for use on A–12 to non–A–12 programs on a total cost basis. Westinghouse's termination settlement proposal, Form SF 1436, took into account Transferred Costs as well as Disposals and

Other Credits. Westinghouse placed the transferred cost amount on line 16, which accounts for disposals and other credits, then applied a loss ratio to that amount.

The Government argues that the entire amount of transferred inventory should have been included in Disposals and Other Credits without taking into account the loss ratio. This would have further reduced the Government's liability.

DCAA Contract Audit Manual § 12–311 provides instruction as to the type of items included within the Disposals and Other Credits line on Form SF 1436. The section states in part:

> Credit amounts included in a settlement proposal normally represent (1) an offer by the contractor to purchase inventory at less than cost, (2) the proceeds from the sale of termination inventory, or (3) a combination of (1) and (2). . . .

Westinghouse transferred common items at full cost to a non–A–12 program. It did not offer to purchase or sell inventory. Thus, the cost of the transferred inventory should not be included at all on line 16 (Disposals and Other Credits). The plain language of DCAM § 12–311 suggests that the Government's interpretation is incorrect.

Westinghouse transferred common items for other uses as instructed by FAR 31.205–42 and FAR 45.606–2. Although Westinghouse included the transferred costs of the inventory under Disposals and Other Credits on Line 16, it applied a loss ratio to the costs. This has the same effect as if Westinghouse had included the costs on Line 7 (Transferred Costs), then applied the loss ratio to the remainder. While it would have been proper to include the entire amount of transferred costs on the transferred cost line, thereby reducing total costs before applying the loss ratio, Westinghouse essentially removed those transferred costs from the settlement equation by applying a loss ratio to them on the Disposals and Other Credits line.

Moreover, according to DCAA's training manual (Audit of Terminated Contracts, FAO Training Course 2211), removal of common items from program costs prior to applying a loss ratio is required. While Westinghouse did place the transferred cost amount on the Disposals and Other Credits line, it essentially took the cost of those transferred items out of the settlement proposal by applying the loss ratio to them. The Government's liability remains the same.

### 6. Consideration of REAs

Westinghouse submitted requests for equitable adjustments totaling $44.5 million as part of its termination settlement proposal. General Dynamics settled those claims for $11 million, but it did not determine who was responsible for the adjustment. General Dynamics did not verify that REAs paid to Westinghouse arose solely because of government fault, but paid the REAs and claimed $10 million as part of its termination settlement proposal. Defendant contends that it cannot be held liable for such claims when General Dynamics does not prove that government conduct or inaction caused the adjustment. The Government challenges $10,098,968 [8] of the settlement as "pending."

■ This argument is essentially a reiteration of a government motion that we denied earlier. We stated before trial that the court would "consider the reasonableness of challenged subcontractor REA payments on the same basis as other costs allegedly incurred." *McDonnell Douglas Corp. v. United States*, No. 91–1204, at 2 (Fed.Cl. June 13, 1997) (denying defendant's motion for pretrial determination that plaintiffs cannot recover amounts claimed for their subcontractors' requests for equitable adjustment). Costs are reasonable so long as they do not result from plaintiff's willful neglect or wrongdoing. *Id.* at 1. Settlements must be negotiated in good faith and incorporate the exercise of business judgment.

■ Westinghouse sought equitable adjustments totaling $44.5 million. General Dynamics obtained advice and assistance

---

**8.** The Government determined that the impact of agreeing to pay Westinghouse $11 million in REAs is $10,098,968, after recomputing segregated loss ratios. We stated that Westinghouse was entitled to a combined loss ratio, so the Government's figure is incorrect. As we did not sustain this challenge, however, we need not determine the actual impact of the payment.

from technical, financial, and legal representatives before settling these claims. Engineers for General Dynamics reviewed the requests for equitable adjustments and determined that Westinghouse was entitled to an adjustment ranging from $12 million to $18 million. General Dynamics' lawyers proposed a range of adjustment from $9 million to $11 million. The actual $10 million adjustment incorporated the exercise of business judgment. Defendant has not shown that plaintiff's willful neglect or wrongdoing prompted the claims; nor is there a hint of bad faith.

### C. Other Subcontract Challenges

We do not reprise the legal standards described in rulings above concerning Norden and Westinghouse. It is sufficient to state that no credible evidence of bad faith, willful neglect, or wrongdoing has been presented with respect to any of the following subcontracts: General Electric Aircraft Engines, Allied–Signal–Torrance; Allied Signal–Teterboro; SJ & LA–Hughes; Harris Corporation; SCI Technology, Inc.; Litton Systems; Sundstrand Aerospace; Menasco Aerospace; and Parker Hannifin. McDonnell Douglas' claimed incurred costs with respect to these subcontracts may be awarded, as they are reasonable, allowable and allocable. Plaintiff General Dynamics' claimed incurred costs with respect to Litton Amecon; GE—Utica; Martin Marietta; Models and Tools; Teledyne Ryan; Hewlett Packard; Motorola; Arkwin; Struthers Dunn; Parker Hannifin; and Hexcel also are reasonable, allocable, and allowable.

## II.

### SUBCONTRACTOR REQUESTS FOR EQUITABLE ADJUSTMENTS

The Government challenges various subcontractors' requests for equitable adjustments, because "it is now uncontroverted that neither General Dynamics [n]or McDonnell Douglas even attempted to establish Government liability for the REAs." We stated in June 1997 that the court would "consider the reasonableness of challenged subcontractor REA payments on the same basis as other costs allegedly incurred." Plaintiffs

exercised sound business judgment with regard to paying REAs to subcontractors. A court should not second-guess contractors who make reasoned decisions in such circumstances, as noted above. Such costs claimed by plaintiffs are reasonable, allocable, and allowable.

We have even less reason to question plaintiffs' costs with respect to requests for equitable adjustments in this area than in the Westinghouse situation, given the evidence presented. The Government argues that "there is a requirement that a prime contractor evaluate a subcontractor claim to determine Government liability." If so, this is not a case in which the plaintiffs blindly passed on a claim for costs by the subcontractor to the Government. We see no compelling reason for subcontractors' requests for equitable adjustments to be treated differently from other subcontractor settlement costs. *See* FAR 49.201(b) ("The parties may agree upon a total amount to be paid the contractor without agreeing on or segregating the particular elements of costs or profit comprising this amount"). As Allen Broesche, a witness for General Dynamics, testified: "It was our money, and we reached a reasonable settlement." Plaintiffs had no expectation that any of these expenses would be reimbursed by the Government while negotiating with subcontractors over REAs or any other settlement expenses. We cannot disallow these costs.

## III.

### DIRECT MATERIAL

[T]he audit team performed audit procedures, including sampling, to evaluate the allowability, allocability, and reasonableness of the [General Dynamics] and [McDonnell Douglas] direct material line (Line 1) items in their January 1994 Update. These procedures were supplemented by Coopers' review of the February 1997 Update, and, as a result, Coopers questioned a total of $14,955,000 in MDC direct material costs ... and $53,143,152 of GD's proposed direct material costs. Additionally, Coopers categorized $9,935,196 as pending for MDC due to MDC's failure

to perform a commonality study. In general, the questioned direct material costs include overpayments to vendors, defective items that were returned and not properly credited, items actually used or usable for other programs, excess purchases, purchases incurred long before required, and inadequate or sloppy documentation.

### A. General Dynamics—Direct Material

#### 1. Sample Testing of General Dynamics' Costs

Coopers & Lybrand's audit team "reviewed documentation to verify necessity, cost, payment, receipt, physical existence, and disposition." Mr. Miller testified that General Dynamics did not provide the audit team with appropriate termination inventory schedules. Robert Wright [9] generally agreed that General Dynamics' inventory schedules were not available. According to Defendant, General Dynamics' 'accounting system' was incapable of providing the audit team with termination inventory schedules, as required by the FAR, which would have identified the current physical location and estimated costs of material that GD purchased from vendors. As a result, the audit team used an accounts payable system and statistically selected transactions for further testing.

Using audit sampling procedures, the audit team selected for review 47 items by vendor and purchase order number. Mr. Miller testified that in developing the sample to be tested, the audit team received technical assistance from the DCAA office in Memphis, Tennessee. After testing the "sampled items," the audit team met with General Dynamics personnel to seek additional explanation or further documentation as appropriate. After evaluating the responses the audit team either would withdraw the preliminary exceptions or leave them in place, depending on the documentation available.

"Dollar unit sampling" focuses on the dollars in a given accounting population. The audit team used this method for review of General Dynamics' incurred direct costs. According to the DCAA Contract Audit Manual, dollar unit sampling is a valid technique to account for the reasonableness of costs incurred for direct material. *See* DCAM B–503.1. We agree with the Government that audit sampling is recognized by the accounting and auditing profession as being a proper and appropriate method for review.

Miller testified that in dollar unit sampling "you're not looking at every dollar in the population, you're only looking at certain dollars in the population, but those are representative and will be representative of the rest of the population." When errors in the sample population are found, an error proportion is calculated and used to determine the extrapolation percentage. "Of approximately 22 million [dollars] reviewed, Coopers identified $6.36 million of questioned costs within the sample. Using dollar unit sampling procedures, Coopers projects the total amount of questioned direct material costs to be approximately $53,143,152."

■ While we recognize that the audit team's methods applied proper sampling techniques, we do not agree with all of their findings and extrapolations. Mr. Miller questioned many direct costs incurred on the grounds of allocability and allowability. Where sufficient evidence of allowability, allocability and reasonableness of costs are found, however, the court must sustain those costs as incurred.

#### 2. Lack of Documentation

##### a. Bell Helicopter

■ General Dynamics purchased a tool for the wingfold of the A–12 from Bell Helicopter. Defendant claims that General Dynamics paid Bell Helicopter "over and above the price listed in the purchase order reviewed." The audit team questioned $2,671 of $23,055 paid to Bell Helicopter because it was not satisfied that General Dynamics' doc-

---

9. Wright had primary responsibility for the preparation of General Dynamics' termination for convenience claim. A long-time employee of General Dynamics in the financial cost accounting area, he had served as the deputy program director of business management for the A–12 program since 1984. Allen Broesche, John Lamers, and Ron Hancock also had worked on the A–12 program during performance of the contract.

umentation supported the costs claimed. General Dynamics explained that it "could not locate the change order that would have explained the precise reason for the second of two increases in the purchase price of the tool, which increased the price from $20,384 to $23,055." The audit team extrapolated a challenge of $885,135 in costs from the $2,671 figure.

Other documentation supports General Dynamics' position. It paid Bell Helicopter $23,055 pursuant to an invoice for the manufacture of an A–12 tool. Before issuing a check to Bell Helicopter, General Dynamics' accounts payable clerk made a notation on the check indicating that she had verified the invoice amount against the final purchase order amount that had been entered by the buyer in the procurement file. Mr. Miller acknowledged the existence of documentation indicating that the change was for "rework." General Dynamics contends that it is common for rework to be done during the manufacture of tools developed for a RDT & E; here there is no dispute that Bell Helicopter was providing tooling work.

The court's role is to determine whether General Dynamics incurred the cost, whether it did so for the A–12 contract, and whether it did so for a legitimate purpose. Although Mr. Miller did not find these factors sufficient to document the increased cost, evidence presented at trial satisfied the court that the entire cost was allowable, allocable and reasonable. *See, e.g.,* FAR 49.201(c).

### b. Cohn and Gregory

■ The audit team challenges the entire $7,714 the General Dynamics paid to Cohn & Gregory for PVC piping and valves. After extrapolation, this becomes a challenge of $7,640,132.

The audit team sought a "requirements listing" to determine whether the items purchased from Cohn & Gregory were required for the A–12. General Dynamics provided no such list, but submitted the declaration of an employee, Steve Wells. Mr. Miller testified that this representation was not sufficient to make a determination of allowability, allocability, or reasonableness. General Dynamics acknowledged that it could not produce much documentation other than the declaration. However, Mr. Wright testified that the PVC pipes and valves were purchased for an environmental control test stand for the A–12. Mr. Wells was the buyer of the material. His declaration stated that "[t]he fittings and other hardware was purchased to build the test setup shown in the drawings." An invoice from Cohn & Gregory, signed by Wells, contains a unique A–12 work order number. This cost is properly awardable.

### c. Fiber–Resin Corporation

■ General Dynamics claims costs for tooling foam boards that were shipped to Cadillac Motor Car Division as furnished material to be used to manufacture a tool for A–12 (Tool # R15649). Coopers questioned $30,774 associated with this item for lack of documentation "and an inability on the part of GD to demonstrate the use, location, or disposition of this material." Cadillac was not a General Dynamics A–12 vendor, but it was a vendor to Models & Tools, an A–12 subcontractor. Using its sampling technique, Coopers & Lybrand extrapolated a challenge of $7,640,132 from the $30,774 questioned item.

Mr. Miller testified that General Dynamics did not provide sufficient documentation to support this cost item. Coopers & Lybrand reviewed an internal General Dynamics audit of Models & Tools and found that General Dynamics' own analysis concluded that Models & Tools' cost accounting system was inadequate. The cost accounting system failed to identify the tooling foam boards, for example.

Payment was made to Fiber–Resin, the producer of the foam board, while the board was shipped to Cadillac. The type of foam board ordered is consumed during the production of a tool. After termination, General Dynamics issued an abandonment certificate to Models & Tools for Tool # R15649. This indicates that the tool, which was classified as work-in-process, had no value. DCAM 2–202(a) provides that because "audits frequently require a wide variety of skills, an auditor may need technical assistance from other disciplines such as legal, engineering, and production/quality control. The auditor should make arrangements to secure any needed technical assistance from the ACO/

plant representative or responsible acquisition agency." General Dynamics argues that Miller should have sought technical assistance in such a circumstance.

Plaintiff's documentary evidence and its testimony concerning consumption of the foam board material justify award of its costs.

### 3. "Expediting Charges"

Coopers questioned certain of General Dynamics' direct material costs because General Dynamics paid premium prices for expediting delivery of items "long before they were actually required by GD." The Government points out that many of the materials in issue still were on hand when the contract was terminated.

#### a. Stanley Aviation

■ The audit team challenged $70,077 in expediting charges paid to Stanley Aviation for providing parts for the A–12 full-scale mock-up. Miller questioned this amount at trial "due to the fact that the item was not used at termination, yet it had been expedited earlier." The sampling technique here creates a $6,626,207 challenge.

The minutes of a meeting of the General Dynamics "Procurement Ad Hoc Committee" on September 21, 1989 include the following entry concerning the Stanley Aviation order: "*Schedule:* The A–12 program schedule dictates the requirement for procurement to initiate an expediting fee to authorize the supplier to perform to an expedited schedule that supports the A–12 program needs." According to General Dynamics, "the parts still were on hand at termination because the A–12 delivery schedule was extended by 18 months in 1990, *after* these parts were ordered." The full-scale mock-up was affected by this schedule change.

The Government did not establish that *when the purchase order was placed* with Stanley Aviation, General Dynamics should have known it did not need to expedite delivery. General Dynamics points out that this is another area in which Miller could have

benefited from technical and contract assistance. *See* DCAM 2–202(a).[10]

General Dynamics made a reasonable business judgment at the time the purchase order was made. The fixed-price nature of the contract and the attendant cost risks undertaken by General Dynamics, along with credible testimony at trial that General Dynamics did not make the decision to incur expediting charges lightly, support this conclusion. *See, e.g., Boeing Aerospace Operations, Inc.,* ASBCA Nos. 46274, 46275, 94–2 BCA ¶ 26,-802, at 133,282, 1994 WL 96970 (March 21, 1994) (reasonableness is judged by considering "all of the relevant circumstances existing at the time of the incurrence of the costs") (citing FAR 31.201–3), *aff'd on recons.,* ASBCA Nos. 46274, 46275, 94–3 BCA ¶ 27,-281 at 135,908, 1994 WL 651887 (November 9, 1994).

#### b. Standard Pressed Steel & Kamatics

Coopers & Lybrand challenges $3,007 in expediting charges to Standard Pressed Steel—extrapolated to arrive at a $2,792,498 challenge. The entire amount of a $2,059 acquisition of ball bearings from Kamatics is questioned as well. This amount is increased to a challenge of $7,640,132. Mr. Wright testified that in both of these situations, "expediting was done to meet a schedule of a subassembly, an indentured-type system for manufacturing." As mentioned above, General Dynamics had to consider carefully any decision to incur expediting charges. The charges incurred here are properly awardable.

### 4. Other Direct Material Challenges

#### a. Sierra Alloys

■ Coopers & Lybrand challenges $220,924 of a $421,764 purchase of 42 pieces of titanium from Sierra Alloys, to be used for the inner wing engine bay doors and the inner wing. The audit team could account for only 20 of the 42 pieces at termination, and it challenged the cost of the other 22 pieces. The $220,924 challenge is extrapolated to $4,001,974.

10. Mr. Miller acknowledged, for example, that he did not know the first flight date. He maintained that he did not necessarily need to know anything about the contract schedule to challenge a cost related to an expediting charge.

According to General Dynamics, even if 22 of the pieces somehow were "lost," its termination claim should be reduced only by the fair market (salvage) value of those 22 pieces. *See* FAR 49.204 and DCAM 12–304.10 (with respect to termination inventory that is undeliverable to the government because it was damaged, destroyed, or lost, the fair value of such undeliverable material should be deducted from the termination settlement proposal). General Dynamics points out that proceeds from the sale of 12 pieces of scrap garnered $ 17,765—approximately $1,480 each. Applying this average price to the 22 "lost" pieces, the value of the challenged pieces totals $32,560.

We find that a $32,560 deduction is appropriate because that is the fair value of the lost material. Extrapolating from that figure, we deduct $589,815 from plaintiffs' claim.

### b. Stewart–Warner

■ This challenge is to $36,315 of a $435,780 purchase of 12 instrument landing systems from Stewart–Warner. The audit team could account for only 11 of the 12 items at termination, so it challenged the entire acquisition cost of the twelfth item. Using its sampling methodology, the audit team extrapolates a challenge of $636,678.

General Dynamics argued that because records were available for the other eleven items, it should be entitled to a credit because "all parts have been accounted for." The Government contends, that "[t]he fact that GD was able to provide adequate documentation regarding the eleven that went to salvage suggests that the twelfth was not salvaged."

General Dynamics ordered, received, and paid for 12 items for use on the A–12 contract. It rejected one of the 12 items and returned it to the vendor. The vendor later shipped the twelfth item directly to the A–12 manufacturing facility in Tulsa, Oklahoma. General Dynamics attempted to return the items to Stewart–Warner after the contract was terminated, but Stewart–Warner refused to accept them. General Dynamics salvaged eleven of the items for little value. We have no documentation concerning disposition of

the twelfth item, but these facts are not in dispute.

General Dynamics argues that "it is reasonable to rely on the termination procedures established by the contractors, which reasonably attempted to account for and dispose of all A–12 inventory." It notes further that the contract had been terminated for default, so "at the time GD disposed of the A–12 inventory it had no guarantee it ever would recover its incurred costs, and the company thus had an obvious incentive to dispose of its inventory in a manner that would recover as much of the cost of the item as possible."

We cannot find sufficient grounds for awarding the value of the twelfth item as an incurred cost. As mentioned above in the Stewart–Warner context, the FAR and DCAM contemplate that when inventory is lost, the fair value of that material should be deducted from the termination settlement proposal. That could be accomplished here by considering the value of the eleven items sold for salvage to arrive at a value for each item, and then applying that value to the twelfth item. We did not hear evidence of the salvage value of those items, other than testimony that they had very little value. We therefore cannot impute a salvage value to the twelfth part, and instead must deduct the acquisition cost of the twelfth item from General Dynamics' proposal. This method is consistent with the Government's challenge. We therefore sustain the extrapolated challenge argued by the Government, $636,678.

### c. Universal Alloy

Coopers questions certain costs for materials in excess of the requirements of the A–12 FSED contract and Lots I and II options. For example, GD purchased aluminum from Universal Alloy for use on various programs, including the A–12. GD originally charged the costs of a small portion, only 24 feet, to the A–12 contract; in fact, the purchasing document specifically stated that the remainder of the aluminum was for "various prime contracts." However, more than two years after termination, GD charged an additional 262 feet of the aluminum to A–12. As there is no evidence that the A–12 program required

aluminum in excess of 24 feet, Coopers questions all costs for aluminum in excess of that amount.

The challenge based upon these costs is $7,640,132—extrapolated from an initial figure of $1,670.

■ We are persuaded that allocation to the A–12 contract was reasonable. FAR 31.205–42(a) defines common items as those "reasonably usable on the contractor's other work." Testimony from Mr. Wright indicates that although some aluminum may have been available for use on other programs if needed, no such need developed. The aluminum had been acquired originally for the A–12 program. Because the aluminum did not prove to be useful on another program, General Dynamics transferred an additional 262 feet of aluminum (at a cost of $1,670) into the A–12 program on February 13, 1993. At the time of the transfer, the contract was considered to be in default. Thus General Dynamics had no incentive to transfer the costs to A–12 when reimbursement by the Government was unlikely. We find that this cost is properly awardable to General Dynamics.

### d. Voi–Shan Manufacturing

■ Defendant challenges a $1,902 purchase of 46 bolts from Voi–Shan Manufacturing—extrapolated to arrive at a challenge of $7,640,132. Defendant's position is that these items should have been returned to the manufacturer, likely for full credit.

Plaintiff points out that FAR 45.605–2 permits a contractor to recover from the Government a restocking charge of up to 25% of the cost of the returned items, as well as transportation and handling costs associated with the return. *See also* DCAM 12–304.8 ("The contractor may not include the cost of returned property in the settlement proposal but may include the transportation, handling, and restocking charges for the returned property"). Mr. Miller conceded that the cost of returning the bolts may have met or exceeded the entire $1,900 purchase price.

General Dynamics judgment not to return the bolts was sound, given the doubtful economic value of returning them.

### B. McDonnell Douglas—Direct Material

The Government divides McDonnell Douglas' direct material costs into three categories: (1) contractor furnished equipment; (2) subcontract costs; and (3) manufacturing material. In reviewing McDonnell Douglas' claimed direct material costs, the audit team tested the "control, physical existence, and disposition or termination inventory on hand at the time of the audit."

Unlike General Dynamics' accounting system, McDonnell Douglas' records permitted the audit team to review incurred direct costs through non-statistical sampling means:

MDC's records permitted the Audit Team to conduct physical inventory verification testing with regard to termination inventory on hand in August 1994. Mr. Miller testified that, as a result of these procedures, the Audit Team found discrepancies in quantity, description, or location in nearly one-third of the 76 items that the Audit Team selected for verification. Coopers could not project the results of this sample to the entire population because MDC did not provide priced inventory schedules. Therefore, Coopers questions only $75,042, which represents the specific items quantified.

Physical inventory verification testing is a proper sampling method. If sufficient evidence sustains a claimed cost, however, the cost should be awarded.

### 1. Damaged and Defective Inventory

■ The Government asserts that after the physical inventory procedures, McDonnell Douglas supplied documentation as to the location of several missing "CFE/major subcontracts items selected for physical inventory." McDonnell Douglas had also returned certain of these items to its vendors or labeled them as defective, damaged or rework items. According to the Government, "[McDonnell Douglas] provided no satisfactory evidence that it took credit for these damaged or defective components as a part of the subcontractor settlement process and, accordingly Coopers questions $1,439,-405 in associated costs."

Mr. Hancock testified that the costs to repair such items were added to increase

subcontractors' estimates at completion. This would have the effect of reducing the subcontractors' recovery. On the record before the court, we cannot say that these costs are unreasonable.

### 2. Common Inventory

■ The Government also contends that during physical inventory testing, the Defense Plant Representative Officer's technical representatives identified material that could be used on other programs. "The costs of items reasonably usable on the contractor's other work shall not be allowable unless the contractor submits evidence that the items could not be retained at cost without sustaining a loss." FAR 31.205–42(a). Additionally, "[a]ny acceptance of common items as allocable to the terminated portion of the contract should be limited to the extent that the quantities of such items on hand, in transit, and on order are in excess of the reasonable quantitative requirements of other work." *Id.* Additional procedures were performed by the Coopers & Lybrand audit team "to identify amounts of termination stores material that MDC actually used in other programs and, in some cases, purchased from vendors after termination." Based on these procedures, the Government questions a total of $764,282 as "common inventory" because the costs claimed may not be included in termination costs if the inventory could be used on other programs, as alleged here.

Mr. Miller acknowledged that the contracting officer should make a determination whether inventory is common, but that the Government did not do so in this case. He further acknowledged that the Government did not provide an inventory verification report, did not appoint a plant-wide clearance officer, and did not make an assessment of commonality at the time of termination. He stated that with respect to post-termination inventory, the Government's position was that "they wouldn't do anything in terms of dealing with the contractors on inventory, other than to let them know that there had been a termination for default." [11] He stated that "in general, my understanding is that they didn't get involved or want to be involved in that particular process because it was a termination for default." Mr. Hancock testified that all of the direct material costs in the company's claim were in excess of its needs. He detailed McDonnell Douglas' procedure for transferring common items. We cannot question McDonnell Douglas' claims in this area.

### 3. Panstock Cost Transfer

■ The audit team conducted a review of pre- and post-termination journal vouchers, and discovered a February 22, 1991 entry allocating $2,611,179 of panstock to the A–12 program. The Miller report questions the $2,611,179 as a common item unallowable under FAR 31.205–42.

As McDonnell Douglas uses the term, panstock describes low-value, high volume material. Michael Cromer [12] testified that panstock can be either common and used for multiple programs, or unique and used on a single program.

Hancock and Cromer testified that McDonnell Douglas systematically moved panstock and other inventory to other programs where it could, and that its incurred costs do not include any "common items," for which the Government is entitled to credit under FAR 31.205–42(a). In short, McDonnell Douglas sought to mitigate its costs related to panstock.

Panstock should not be treated differently from any other cost challenged as a common item. McDonnell Douglas tried to limit the amount of panstock attributable to the A–12 contract by attempting to find a use for it on other contracts. The remaining A–12 panstock exceeds McDonnell Douglas' needs; it remains a cost to which McDonnell Douglas is entitled.

### 4. Fixtures Loaned to Other Programs

■ The Government maintains that Coopers identified six significant test fixtures of physical inventory that reportedly were being used on other McDonnell Douglas programs. The costs for these items, however, remained in McDonnell Douglas' January

---

**11.** *See supra* note 1.

**12.** Mr. Cromer was McDonnell Douglas' manager of government accounting.

1994 termination settlement proposal update. According to the Government, "McDonnell Douglas would not quantify the costs of the fixtures prior to Coopers' issuance of its May 8, 1995 incurred cost audit report." After the incurred costs audit report was issued, the Government learned through discovery that McDonnell Douglas had "quantified the costs of five of the test fixtures at $10,065,-599." Coopers questioned this entire amount.

Special test equipment is an allowable and recoverable A–12 contract cost under FAR 31.205–40. Mr. Miller admitted that the six test fixtures were built specifically for the A–12 contract. Miller argued that the costs nevertheless should be recovered under other contracts because the test equipment had been loaned occasionally after termination. In McDonnell Douglas' view, this simply mitigated costs to the Government. McDonnell Douglas points out that "no contracting officer on any other program has agreed to accept or pay any portion of the costs of the special test equipment." It concludes based on the foregoing that there is no basis to disallow this $10,066,000 in special test equipment costs under FAR 31.205–40. To do so would mean that it "could not recover its incurred costs under the A–12 or any other contract."

We agree. These costs are awardable to McDonnell Douglas.

### C. Other Costs—General Dynamics and McDonnell Douglas

#### 1. Unabsorbed Overhead

■ The Government argues that McDonnell Douglas cannot recover unabsorbed overhead costs:

Coopers identified and questioned $12,-538,718 in costs transferred, after termination of the prime contract, from overhead pools to the Termination Proposal.

These costs were for facilities and were charged to overhead pools during the performance of the A–12 contract. However, after termination MDC attempted to charge these costs specifically to the A–12 contract, even though prior to January 8, 1991, other contracts absorbed these costs pursuant to MDC's overhead allocation policies. Neither Mr. Hancock nor Mr. Cromer, the two witnesses proffered by MDC to testify to this issue could explain why the accounting basis of the treatment of these overhead costs was different after termination than before. Significantly, MDC presented no expert evidence to rebut Mr. Miller's testimony that the costs in question were "by their very nature, overhead costs." Indeed, MDC questioned these same types of costs in settling with its subcontractor, SJ & LA–Hughes.

These alleged costs were, in actuality, claims for unabsorbed overhead, inasmuch as they represented overhead costs that MDC allegedly could not be [sic] recover, using the post A–12 business base for allocating its overhead costs. As such, the law proscribes their recovery in a termination for convenience. *See* DCAAM ¶ 12–305.7(b)–(c); F. Alston, M. Worthington, & L. Goldsman, CONTRACTING WITH THE FEDERAL GOVERNMENT 360–61 (3d ed.1992).[13]

McDonnell Douglas disputes the Government's characterization of this expense as unrecoverable unabsorbed overhead. Mr. Cromer testified that the $12,539,000 amount was specific to the A–12 contract and that it represented the cost of idled A–12 facilities accounted for exactly as DCAA has required on two other terminated contracts.

The issue is whether it was proper for McDonnell Douglas to remove such costs from the company's overhead pools, and include them in the termination proposal as incurred for the A–12 program.[14]

Q: Okay. And prior to the termination of the A–12 contract, where were those costs reflected?
A: They were reflected in capital assets and then the depreciation went into overhead.
Q: So those costs were allocated among all contracts at McDonnell Douglas, or at least government contracts, including the A–12, right?

---

**13.** *Cf.* P. Trueger, ACCOUNTING GUIDE FOR GOVERNMENT CONTRACTS (10th ed.1991) 713–25 (discussing court and board cases on recovery of unabsorbed overhead).

**14.** The Government pressed Cromer on cross to explain why the $12.6 million in costs were transferred:

Cromer and Hancock testified that the idle facility costs were specific to the A–12 contract, but were charged to overhead pools until termination. According to Cromer, the practice of assigning depreciation into an overhead pool—without regard to whether it was a program-specific asset or a general administrative cost—was standard for McDonnell Douglas. In other words, the fact that an asset was in an overhead pool did not necessarily identify that asset as a general, administrative type of asset. Mr. Hancock testified that McDonnell Douglas attempted to find alternative uses for the facilities that were specific to A–12. He stated that after the facilities remained idle for some time, however, "we decided that we would claim these costs."

Mr. Cromer testified that claiming these costs in the A–12 termination proposal was not an aberration. He described two prior incidences of adjusting overhead depreciation pools following a convenience termination. Cromer testified that after the Tacit Rainbow Program was terminated for convenience, the DCAA "specified in their audit report that it should be charged directly to the termination claim." Similarly, with respect to the Atlas program, costs in the overhead pool were "moved from the overhead pool and charged directly to the termination claim on the Atlas program."

These assets were program-specific; their costs were incurred in performing the A–12 contract. Asset costs assigned to overhead pools nevertheless can be program-specific,

and included in a cost proposal associated with the termination of that program. Based on its prior experience with the DCAA, McDonnell Douglas sought to recover incurred costs inextricably associated with the A–12 program. We find that these costs are reasonable, allowable, and allocable.

### 2. Material Handling Expense

 Coopers and Lybrand questioned $6,700,000 in material handling expense charges at General Dynamics related to unliquidated progress payments. Material handling charges are incurred when material is handled as it arrives. According to defendant, General Dynamics is "attempting to charge the Government for costs that were not and could not possibly have been incurred."

The base used to calculate its material handling expenses includes the amount of unliquidated progress payments paid by General Dynamics to its subcontractors. Mr. Miller testified that he challenged these costs because "they were payments included in the termination for convenience proposal for material handling expenses, overhead expenses for material handling, that were applied to progress payments that didn't represent deliveries and shipments."

General Dynamics notes that the costs related to material handling are principally labor, such as "the costs of paying people to move items in and out of warehouses and to help procure material." [15]

A: That is correct.

. . . .

Q: Can you explain why you decided to move the costs out of the overhead pools to the A–12 termination?

A: Because that was our policy at McDonnell Aircraft Company relative to assets that related to a terminated contract.

Q: Can you tell me why you did it, though? I mean, theoretically, what was the underpinning of that decision?

A: The basis for that was that these assets were acquired for a particular program, and they were capitalized and depreciated. And when a program was terminated, it is part of the cost associated with that program. I guess that's basically all I can describe it as.

Q: But you would agree with me, sir, that prior to the termination, even though the assets had been acquired for a specific program,

you were recovering those costs by charging them to all contracts, A–12 and others?

A: They were included in the depreciation and the overhead expenses, yes, sir.

15. General Dynamics provides the following additional explanation in its post-trial brief:

At GD's Ft. Worth division, a pool of people at one end of the factory waited to receive material, which would pass through inspection and be delivered to the place on the factory floor where it was needed. These expenses were incurred whether or not material was being handled. GD divided the expenses for this labor between the various contracts at the Ft. Worth division. To divide the costs between the contracts, a "base" was established, and a rate that was negotiated with the ACO was applied to the base to determine the amount to be charged to each contract. The base that

We find that the material handling costs noted by General Dynamics were incurred. It had used the same accounting system before with Government approval. The system provided a method whereby General Dynamics could allocate material handling costs to different contracts, thus accounting for A–12 expenditures properly. General Dynamic's accounting system was not unreasonable. We see no reason to impose a new allocation method upon plaintiff retroactively. *See Litton Systems, Inc. v. United States,* 196 Ct.Cl. 133, 449 F.2d 392, 399 (1971).

### 3. Excessive Overtime

#### a. General Dynamics

Coopers listed as pending $3,829,421 of General Dynamics' overtime expenses because the company apparently could not explain adequately why it experienced overtime hours in excess of that estimated in its Best and Final Offer.

No legal authority mandates that overtime cannot exceed the target estimates made in a BAFO. This was an incentive contract. Plaintiffs point out that Mr. Miller lacked the technical expertise to appreciate the need for significant overtime in General Dynamics' performance of the contract. *See* DCAM 2–202(a).

 The standard that we employ to determine the awardability of the overtime expenses claimed here is whether they are allowable, allocable, and reasonable. *See, e.g., Worsham Constr. Co,* ASBCA No.25907, 85–2 BCA ¶ 18,016, at 90,369, 1985 WL 16693 (March 22, 1985). Testimony at trial established that the overtime was incurred in performance of the A–12 contract. The overtime did not exceed an amount that would

have been incurred by a prudent business person, and therefore is allowable. *See, e.g.,* FAR 31.201–2, –3, –4.

#### b. McDonnell Douglas

 The contract did not limit overtime. Additionally, it was not necessary for the contracting officer to approve overtime before McDonnell Douglas could incur the expense. We find that $11,605,000 challenged by the Government here is properly awardable to McDonnell Douglas.

### 4. General Dynamics Offload

 General Dynamics transferred a number of tasks to McDonnell Douglas for completion during the course of performance. The audit team grew concerned about costs related to such tasks. "Because the potential duplication of effort has not been quantified by either MDC or GD, Coopers determined that costs associated with this effort may represent costs that GD experienced as overruns." According to defendant, this establishes that plaintiffs did not meet their burden of proving entitlement to these costs: "Neither plaintiff presented evidence as to whether the work in question was a duplication of effort which might be unreasonable for the plaintiffs to recover from the Government."

Mr. Hancock's explanation of the transfer of certain tasks was simple: "McDonnell Douglas could build them quicker than General Dynamics could." He testified that he knew of no duplication of function, even though "[t]owards the latter part of 1990, the issue was discussed at almost every meeting."

---

GD used for all of its contracts, including the A–12, included both liquidated and unliquidated progress payments. GD had used this method for years, with disclosure to, and approval by, the government.

. . . .

Nevertheless, [Coopers] challenges the use of this method because it appears to allow GD to recover material handling on materials—represented by unliquidated progress payments—that were never handled. This challenge ignores the fact that the base is merely a method to estimate the proper allocation of actually incurred overhead between various contracts. The challenge in fact would have the effect of

denying GD reimbursement of material handling expenses actually incurred. Because GD—with full knowledge and approval of the government—divided its pool of costs among its various contracts using a calculation that included unliquidated progress payments, removal of those payments from the A–12 base after the fact would result in underestimating the A–12 contract's pro rata share of those actually incurred expenses. The government cannot retract retroactively its approval of a contractor's established accounting method to the detriment of the contractor. *See Litton Systems, Inc. v. United States,* 196 Ct.Cl. 133, 449 F.2d 392, 394, 399–401 (1971).

We have no basis to suspect duplication of efforts between plaintiffs other than, as Miller termed it during trial, "healthy auditor skepticism." We found no evidence of duplication. This cost is properly awardable.

### 5. Relocation Expenses

#### a. General Dynamics

■ The Government challenges relocation costs of $2,931,977 incurred by General Dynamics. Defendant states that the "benefitting" contract should be charged for the relocation expenses and not the A–12 contract. That is, "if an employee is transferred to another program, for example, the F–16 or the F–18, then those programs and not the A–12 should pay for those costs." Defendant invokes FAR 31.205–35(e), which provides that "costs of family movements and of personnel movements of a special or mass nature are allowable. The costs, however, should be on the basis of work (contracts) or time period benefited."

General Dynamics argues that these relocation expenses benefitted the A–12 contract within the meaning of FAR 31.205–35(e). Further, the costs are properly allocable to the A–12 contract as continuing costs after termination, pursuant to FAR 31.20542(b). To perform the contract, General Dynamics relocated employees from Ft. Worth to assignments in other locations, such as St. Louis, Tulsa, Patuxent River, and Alamogordo. These employees returned to Ft. Worth after termination. General Dynamics included the costs of returning such employees to Ft. Worth in its Best and Final Offer, which makes these expenses an "explicit premise of the contract."

FAR 31.205–42(b) provides that "costs which cannot be discontinued immediately after the effective date of termination are generally allowable." The DCAM provides, in illustrating this FAR provision:

> For example, the contractor may have contract personnel at a remote or foreign location or there may be personnel in transit to or from these sites. The cost of their salaries or wages would be allocable to the terminated contract for a reasonable period required to transfer the personnel to sites for termination or used on the contractor's other work.

DCAM 12–305.7(a)(1).

"No principled distinction can be drawn between the cost to relocate an employee after termination and the cost of that employee's salary while he relocates," according to General Dynamics. We agree, especially because the BAFO included a reference to relocation. The costs incurred to return the contractors' employees to their home base after termination are allocable to the A–12 contract. They are properly included in plaintiffs' termination for convenience recovery.

#### b. McDonnell Douglas

The Government challenges $78,000 in relocation costs claimed by McDonnell Douglas. Relocation costs were included in the contractors' proposals. As stated above, FAR 31.205–42(b) recognizes that "costs which cannot be discontinued immediately after the effective date of termination are generally allowable." The DCAM provision illustrating FAR 31.205–42(b) provides examples of allowable termination costs, but they are not meant to be exhaustive. When a contract is terminated, the DCAM contemplates that the salary or wages of a worker may be charged to the terminated contract for a reasonable period, while he is transferred to perform other work or for termination activities. The cost of relocating McDonnell Douglas' employees is similar to the example provided by the DCAM. McDonnell Douglas' relocation costs are properly awarded.

### 6. Application of Overhead Rates to Unallowable Costs

■ The Government notes that "to the extent that unallowable cost is identified, a corresponding adjustment to the amount of overhead costs needs to be made. In essence, if the direct costs are reduced then overhead costs must also be reduced by the approved rate to reflect the proper amount of overhead cost." We agree. The adjustment stemming from our sustaining the Sierra Alloys challenge is $80,144. The deduction in overhead costs resulting from the Government's Stewart–Warner challenge is $86,511. Thus, an additional $166,655 will be deducted from plaintiffs' incurred cost total.

### 7. Miscellaneous Costs

#### a. McDonnell Douglas Helicopter Corporation Purchases

During audit field work at the McDonnell Douglas Helicopter Corporation (MDHC), Coopers identified $785,370 in inventory which was common to other programs and which MDC was attempting to charge to the A–12 in violation of FAR 31.205–42. MDHC was unable to provide documentation to support the incurrence of $166,000 of direct material costs. There was also $84,865 in costs based on the use of billing rates rather than proposed rates. Finally, Coopers questioned $41,441 for incorrectly applied material handling charges. The total amount of costs challenged relating to MDHC is $1,077,976.

We are generally satisfied with the measures taken by plaintiffs in dealing with common inventory. An earlier discussion describes the testimony that we heard from Mr. Miller and Mr. Hancock relating to common inventory. While the common inventory portion of this challenge is not a concern, we are not satisfied that McDonnell Douglas has proven its entitlement to the other costs challenged by the Government. The Government's challenge is sustained in the amount of $292,306.

#### b. Douglas Aircraft Company Purchases and Common Bomb Racks

■ Coopers identified and questioned $1,087,141 in direct material cost for which Douglas Aircraft Company could not provide proper accounting documentation to support the purchase. The costs incurred were for bomb racks that were built initially for the A–12 at Douglas Aircraft Company. Prior to termination, the task of building the racks was transferred to McDonnell Douglas Helicopter Corporation. Separately, Coopers challenged $224,516 in costs incurred by Douglas Aircraft Company related to common bomb rack materials. Mr. Miller testified that the audit team was not provided with adequate documentation as to the propriety of these costs.

Mr. Cromer offered testimony supporting these costs. While documentation of the costs may not have been ideal, the costs were documented nevertheless. Two sets of data were provided; they more or less supported each other. The first was McDonnell Douglas' cost analysis reports reflecting amounts billed by Douglas Aircraft Company. The second consisted of Douglas Aircraft's cost incurrence records, including requisition forms and "purchase order activity forms."

These costs may not be documented sufficiently to satisfy the rigorous accounting standards employed by Mr. Miller. We find, however, that these costs are reasonable, allowable, and allocable.

#### c. Loss on Sale of Office Furniture

■ Mr. Miller questioned the cost of office furniture as common items because such costs are expressly disallowed by FAR 31.205–42. In its termination for convenience proposal, McDonnell Douglas claimed a $1,262,000 loss on the sale of Tulsa facility furniture. Mr. Hancock testified that except for a limited amount of furniture that was transferred for the Government's credit, the furniture was in excess of McDonnell Douglas' needs, and could not be used elsewhere after termination despite efforts by McDonnell Douglas to find an alternative use.

Testimony at trial established that the furniture was purchased for the A–12 contract, and that it was sold at auction after termination. McDonnell Douglas claims the resulting loss. The costs appear to have been reasonable, allocable, and allowable. *See generally* FAR 31.205–16(a) (gains and losses from the sale, retirement, or other disposition of depreciable property shall be included in the year in which they occur).

#### d. Termination Training

■ Coopers & Lybrand challenges $198,000 for termination training provided by Petersen & Co. because it was not specific to the A–12 program. Mr. Hancock's testimony, however, established that this training was provided because the A–12 contract was terminated, and was not attended by non–A–12 personnel. We cannot conclude that these costs were not reasonable, allocable and allowable. These costs are properly considered settlement expenses under FAR 31.205–42(g).

### e. Non–Standard Overhead Rate

Coopers & Lybrand disallowed $29,000 because McDonnell Douglas used "an incorrect rate for nonstandard overhead applied to termination labor." Mr. Miller testified that the use of that rate was not in compliance with the Cost Accounting Standards (CAS) incorporated by FAR Part 31.

Mr. Cromer testified that the $29,000 figure "represents the difference between the nonstandard forecasted rate being applied at September '93 when the initial claim was prepared, versus the year-end rate that was ultimately booked into the accounting records." The correct rate was substituted for the non-standard overhead rate in the 1997 update when the correct rates became available. We do not question Mr. Cromer's credibility on this point.[16]

### f. Robotic Paint and Assembly Pump

█ Coopers questioned $2,978,763 in costs related to a robotic paint and assembly pump. Mr. Miller testified that during the audit inquiry, McDonnell Douglas told the audit team that costs associated with this robotic paint and assembly pump were to be removed from the termination proposal because another program could use it. Instead of removing these costs from its claim, however, McDonnell Douglas increased the costs claimed for this equipment. The Government challenges these costs as being related to common items that are disallowed under FAR 31.205–42(a). Miller's challenge is "based solely on his erroneous belief that the sprayer could be used on another program," according to McDonnell Douglas. Mr. Hancock testified that McDonnell Douglas tried to find a use for the sprayer elsewhere—for a while, it appeared that the sprayer could be used in the F/A–18 program—but ultimately no need for the sprayer arose. This testimony was undisputed.

The costs associated with the robotic paint sprayer are allowable, allocable and reasonable. Costs of idle facilities are allowable if they are necessary when acquired and are idled because of changes in requirements that could not reasonably have been foreseen. *See* FAR 31.205–17.

### 8. Miscellaneous Costs

### a. Computer Sciences Corporation— Depreciation Charges

Coopers & Lybrand challenged $54,879 "related to depreciation expenses of computer equipment." The audit team sought documentation from General Dynamics supporting these costs, but these efforts were unsuccessful, according to the Government.

General Dynamics responds that "the total amount of CSC depreciation was over $4 million, all but $54,879 of which had been reconciled." General Dynamics contends that it could have easily spent more than $54,000 trying to resolve the remaining $54,000. This would have resulted in potential Government liability not only for the $54,879 in depreciation, but also for the cost of the reconciliation effort. Settlement expenses might include "[a]ccounting, legal, clerical, and similar costs reasonably necessary for ... [t]he preparation and presentation, including supporting data, of settlement claims to the contracting officer." FAR 31.205–42(g)(1)(i), (i)(A). Because the Government did not assist with close-out of this contract, General Dynamics had to determine on its own the proper level of expenditure to undertake to substantiate its claims. *See generally* FAR 49.201(c).[17]

The Government challenges only a small amount of CSC depreciation expense. Virtually all of the depreciation was properly reconciled (almost 99%), and we agree with

---

**16.** Additional testimony provided as follows:
Q: When the 1994 update was prepared, it used September 1993 data?
A: That is correct.
Q: And as of September 1993, were there final nonstandard overhead rates for the year 1993?
A: No, there was not.
Q: Are there currently rates for 1993 like that?
A: Yes, there are.
Q: Final rates?
A: Yes.
Q: Are there also final rates for 1994, '95 and '96?
A: Yes, there are.
Q: Are those final rates used in the 1997 update?
A: The final nonstandard overhead rate is used for all of those years, yes.

**17.** *See supra* note 1.

plaintiff that chasing the remaining few dollars would not have been in the Government's interest. The total amount claimed is allowable, allocable, and reasonable.

### b. Retention Bonuses

■■■ Coopers challenged $1,196,000 related to retention bonuses because it said that General Dynamics did not have a "preestablished policy" for giving such bonuses. Mr. Miller testified that retention bonuses were paid by General Dynamics to non-General Dynamics employees.

FAR 31.205–6(a) provides, *inter alia:*

Compensation for personal services is allowable subject to the following general criteria and additional requirements contained in other parts of this cost principle:

. . . .

(3) The compensation must be based upon and conform to the terms and conditions of the contractor's established compensation plan or practice followed so consistently as to imply, in effect, an agreement to make the payment.

The Government relies on the wrong FAR provisions, according to General Dynamics. It had to retain certain key employees to assist in contract close-out, to maintain program security, and to assist with subcontractor settlements. The retention bonuses for such purposes are awardable under FAR 31.205–42(g)(1)(i)—(iii), governing post-termination settlement expenses. This section provides that such settlement expenses are allowable, such as

(i) Accounting, legal, clerical, and similar costs reasonably necessary for—

 (A) The preparation and presentation, including supporting data, of settlement claims to the contracting officer; and

 (B) The termination and settlement of subcontracts.

(ii) Reasonable costs for the storage, transportation, protection, and disposition of property acquired or produced for the contract.

*See also* FAR 52.249–2(f)(3).

FAR 31.205–6(a) applies by its terms only to payments made for services rendered during the period of contract performance, General Dynamics argues. The provision applies only to employees, rendering it inapplicable to those former General Dynamics employees to whom the company paid retention bonuses. General Dynamics argues that even if FAR 31.205–6 did apply, the applicable subsection would be FAR 31.205–6(f)(1). This subsection requires an established policy just as 31.205–6(f)(1) does, but General Dynamics maintains that it set up such an established policy before paying any of the bonuses.

General Dynamics' argument is persuasive. FAR 31.205–42(g)(1)(i)—(iii) appear to contemplate the situation at hand. The Government benefitted from General Dynamics' retention of key employees, at least indirectly. For example, Mr. Broesche negotiated effectively with subcontractors, resulting in settlements for about half the amount sought by the subcontractors. Although General Dynamics's argument that it had an "established" policy of paying such bonuses is somewhat tenuous, the decision to retain key employees served the best interests of the Government as well as those of General Dynamics. We do not question that judgment.

### c. Loss of Useful Value—Material Transfer Credit

The audit team tested a small sample of "transactions involving the transfer of A–12 equipment to the F–16 program" for General Dynamics' "loss of useful value claim." The auditors noted that General Dynamics transferred A–12 equipment to the F–16 program at less than net book value. Net book value at the time was $35,859. The A–12 program was credited only $7,100. The audit team had concerns about and questioned "the difference between the net book value of the item transferred and the credit given to the A–12 program consistent with CAS 409 [Capitalization of Equipment]." The Government challenges $28,759 in costs.

General Dynamics responds that "the $28,759 in equipment was not A–12 equipment, but was company-wide equipment charged to an indirect cost pool." It therefore "would have been improper to credit the A–12 contract with costs associated with its transfer because the value of the equipment (unlike the value of the $7,068.82 in equipment that

was credited to [the] government) had never been charged to the A–12 contract, as Miller erroneously assumed." .

The record before us does not dispute General Dynamics' claim in this regard.

### d. Certification Costs

General Dynamics charged the Government $13,000 in certification costs for its updated termination for "convenience proposal," even though this proposal was not certified, according to defendant. Coopers and Lybrand questioned the $13,000 claimed by General Dynamics as unreasonable.

General Dynamics argues that these costs are allowable settlement expenses under the FAR. *See, e.g.,* FAR 31.205–42(g)(1)(i)(A) (relating to costs necessary for preparing and presenting settlement claims). It "expended these costs as part of a due diligence review of the McDonnell Douglas portion of the termination for convenience proposal." Mr. Wright testified that the claim of which the Government complains was certified both by McDonnell Douglas and General Dynamics after a review of their June 1991 termination for convenience claim. We do not question these costs.

### e. Unsettled Subcontractor Progress Payments

■ Coopers & Lybrand determined that $1,653,406 in costs "representing unliquidated progress payments made to unsettled subcontractors" is still pending. "The ultimate settlement of these remaining subcontractor claims could result in the repayments of some or all of the outstanding unliquidated amount to General Dynamics," according to the Government.

This challenge deals entirely with unliquidated progress payments made to Harris Corporation. Mr. Wright, who was involved in settlement negotiations with Harris at the time of trial, testified that Harris is entitled to retain at least the $1,653,406 amount, and perhaps more. This amount is not contingent or speculative, therefore, and it is properly awarded to General Dynamics. Wright's testimony · is undisputed. This amount is awarded to General Dynamics.

## IV.

### YET TO BE INCURRED COSTS [18]

We ruled last year that plaintiffs are entitled to reimbursement of costs that must be incurred in the interest of national security. The "To–Go" portion of costs claimed by General Dynamics for program security through June 1999 is estimated to be $2,489,-915. McDonnell Douglas' estimate is $1,910,-416. These costs are awarded pursuant to the earlier ruling. McDonnell Douglas has reached a settlement with SCI since the time of trial.[19] Thus, $5 million is no longer a cost yet to be incurred.

McDonnell Douglas' obligation to pay General Dynamics $3.2 million for its efforts in building a turntable is not contingent, and it is therefore included in the judgment. McDonnell Douglas' claim for $2,367,175 for administrative / settlement expenses is denied. Neither the $10,153,895 claimed by General Dynamics for four unsettled subcontractors nor $246,072 claimed for settlement expenses is allowable. We sustain defendant's challenge in the amount of $12,767,142.

### *CONCLUSION*

Plaintiffs claim a total of $3,992,455,272 in reasonable, allocable, and allowable costs. We established a cap on plaintiffs' recovery of $3,499,793,515 for the FSED portion of the contract. Adjusted for funds obligated through the IPR and EPA clauses, the funding cap becomes $3,635,767,376. Adding the

---

**18.** Defendant notes in its post-trial brief:
 The Government challenges plaintiffs' claim for approximately $26 million in contingent costs not yet incurred. These contingent costs are primarily for program security costs, settlement expenses, and settlement with remaining subcontractors. These costs are unallowable. "Pursuant to FAR 52.249–2. Termination for Convenience of the Government (Fixed–Price) the contractor may recover costs incurred in

the performance of the work." *Sterling Millwrights, Inc. v. United States,* 26 Cl.Ct. 49, 112 (1992) (emphasis added). Moreover, cost principles expressly prohibit, in FAR Part 31, recovery of non-incurred, contingent costs. *See* FAR 31.205–7(a) and 7(b).

**19.** McDonnell Douglas agreed to pay $8 million pursuant to the settlement, but its claim remains $5 million.

undisputed amounts of $.212 billion for Lot I and $.030 billion for Lot II, we arrive at a figure of $3,877,767,376. Taking into account progress payments of $2,677,634,556 held by plaintiffs, the amount due plaintiffs is $1,200,-132,820, plus statutory interest on that sum from June 26, 1991 until paid.

The parties asked us to rule on the total amount of plaintiff's reasonable, allowable and allocable incurred costs, irrespective of the cap. The total amount of reasonable, allowable and allocable costs incurred by plaintiffs is $3,978,002,676. The judgment that we enter today, however, is $1,200,132,-820.

The opinion and order of February 20, 1998 is VACATED. The clerk is directed to VACATE the judgment entered February 23, 1998 as well, and to enter judgment for plaintiffs in the amount of $1,200,132,820, plus statutory interest from June 26, 1991 until paid. No costs.