# United States Court of Appeals for the Federal Circuit

2007-5111, -5131

MCDONNELL DOUGLAS CORPORATION,

Plaintiff-Appellant,

and

GENERAL DYNAMICS CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Charles J. Cooper, Cooper & Kirk, PLLC, of Washington, DC, argued for plaintiff-appellant McDonnell Douglas Corporation. With him on the brief were Michael W. Kirk, Howard C. Nielson, Jr. and D. John Sauer. Of counsel on the brief were Caryl A. Potter, III, and Elizabeth A. Ferrell, Sonnenschein, Nath & Rosenthal, LLP, of Washington, DC; and J. Michael Luttig, The Boeing Company, of Chicago, Illinois.

Donald B. Verrilli, Jr., Jenner & Block, LLP, of Washington, DC, argued for plaintiff-appellant General Dynamics Corporation. With him on the brief were David A. Churchill; and Linda L. Listrom, of Chicago, Illinois.

Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel was Kirk T. Manhardt, Deputy Director. Of counsel on the brief were Wendell A. Kjos and Mark A. Romano, Office of the General Counsel, United States Department of the Navy, of Arlington, Virginia.

Gregory A. Smith, Cooley Godward Kronish LLP, of Reston, Virginia, for amicus curiae National Defense Industrial Association. With him on the brief was David E. Fletcher, of Washington, DC. Of counsel on the brief was Ralph C. Nash, Jr., George Washington University Law School, of Washington, DC.

Appealed from: United States Court of Federal Claims

Senior Judge Robert H. Hodges, Jr.

# United States Court of Appeals for the Federal Circuit

2007-5111, -5131

MCDONNELL DOUGLAS CORPORATION,

Plaintiff-Appellant,

and

GENERAL DYNAMICS CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from United States Court of Federal Claims in 91-CV-1204, Senior Judge Robert H. Hodges, Jr.

_____

DECIDED:  June 2, 2009

_____

Before MICHEL, <u>Chief Judge</u>, MOORE, <u>Circuit Judge</u>, and HUFF,[*] <u>District Judge</u>.

MICHEL, <u>Chief Judge</u>.

This case arises from the government's default termination in 1991 of a contract between the United States Navy ("the government") and two contractors, McDonnell Douglas Corporation ("MDC") and General Dynamics Corporation ("GD") (collectively "contractors") to develop a carrier-based stealth aircraft, the A-12 Avenger.  The

---

[*]        Honorable Marilyn L. Huff, District Judge, United States District Court for the Southern District of California, sitting by designation.

contractors challenge the judgment of the Court of Federal Claims in favor of the government. McDonnell Douglas Corp. v. United States, 76 Fed. Cl. 385 (2007) ("McDonnell Douglas XIII"). We heard oral argument on December 3, 2008. Because the overall evidence of record supports a conclusion that the government was justified in terminating the contract for default, we affirm.

## I.    BACKGROUND

This American version of Jarndyce and Jarndyce has entered its eighteenth year of litigation. The detailed facts have been repeated many times previously. See, e.g., McDonnell Douglas XIII; McDonnell Douglas Corp. v. United States, 323 F.3d 1006 (Fed. Cir. 2003) ("McDonnell Douglas XII"); McDonnell Douglas Corp. v. United States, 50 Fed. Cl. 311 (2001) ("McDonnell Douglas XI"); and McDonnell Douglas Corp. v. United States, 182 F.3d 1319 (Fed. Cir. 1999) ("McDonnell Douglas X"). As we are writing what necessarily will become "McDonnell Douglas XIV," we will only provide a summary of relevant facts here.

A.    The A-12 contract

In January 1988, the Navy awarded the contractors a fixed-price research and development contract for the A-12 stealth aircraft. The full-scale engineering and development ("FSD") contract was structured as an incrementally funded, fixed-price incentive contract with a ceiling price of $4,777,330,294. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.249-9 Default provision (Fixed-Price Research and Development), which provides in relevant part:

> (a)(1) The Government may . . . by written Notice of Default
> to the Contractor, terminate this contract in whole or in part if
> the Contractor fails to—
> . . .

(ii) Prosecute the work so as to endanger performance of this contract (but see paragraph (a)(2) of this clause);

. . .

(2) The Government's right to terminate this contract under subdivisions (a)(1)(ii) and (iii) of this clause may be exercised if the Contractor does not cure such failure within 10 days (or more, if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

48 C.F.R. § 52.249-9 (1984).

Under the contract, the contractors were to design, manufacture, and test eight A-12 prototypes according to a specified schedule, with the first aircraft to be delivered in June 1990 (the "first flight" date) and the remaining seven to be delivered monthly through January 1991. The contractors were to conclude their testing of the aircraft by April 1993, the completion time of the Navy's technical evaluation program ("TCHEVAL"). The contractors would also support the Navy's evaluation of the aircraft and further provide training support for three years after delivering training equipment to the Navy in June 1993. In addition, the contract gave the Navy the option to purchase four production lots of aircraft. In May 1990, the Navy exercised its option on Lot I for six aircraft to be delivered between June 1991 and May 1992.

B.     Modification of the A-12 contract

From the start, the contractors encountered difficulties in performing the contract, including meeting the contract schedule and keeping the aircraft weight within specifications. McDonnell Douglas XII, 323 F.3d at 1011. Two weeks before the first flight date, the contractors reported to the Navy that the projected first flight date would be July-September 1991, instead of June 1990 as originally agreed, and the remainder of the contract work would be delayed a corresponding twelve to fourteen months.

They also predicted that the cost of completing the contract would exceed the ceiling price so substantially that it would be "unacceptable" to the contractors. The contractors asserted that a fundamental problem with the FSD contract was its fixed-price structure and proposed that the contract be modified.

At the end of June 1990, the contractors missed the first flight date. The Navy did not terminate the contract. Instead, the contracting officer sent a letter to the contractors in July, expressing "serious concern" regarding the deficient performance under the contract. He warned that the contractors' failure to meet the first flight date "could jeopardize performance of the entire [contract] effort." He also asked for the contractors' plan to meet the rest of the original schedule as well as their proposal for contract revision.

As the parties failed to reach an agreement, on August 17, 1990, the Navy unilaterally issued a contract modification, P00046, which revised the prototype aircraft delivery dates but left Lot I and later milestones intact. The delivery schedules are:

|  | Aircraft Number | Original Delivery Date | P00046 Modified Delivery Date |
|---|---|---|---|
|  |  |  |  |
| Prototype | 1 | June 1990 | December 1991 |
|  | 2 | July 1990 | February 1992 |
|  | 3 | August 1990 | June 1992 |
|  | 4 | September 1990 | August 1992 |
|  | 5 | October 1990 | September 1992 |
|  | 6 | November 1990 | November 1992 |
|  | 7 | December 1990 | December 1992 |
|  | 8 | January 1991 | February 1993 |
|  |  |  |  |
| Lot I | 9 | June 1991 |  |
|  | 10 | August 1991 |  |
|  | 11 | October 1991 |  |
|  | 12 | December 1991 |  |
|  | 13 | March 1992 |  |
|  | 14 | May 1992 |  |

C.    Performance after contract modification

After the contract modification, more problems arose concerning the performance of the contract. During the months leading to termination, the contractors' internal schedules showed that they would not meet the P00046 modified first flight date in December 1991. McDonnell Douglas XIII, 76 Fed. Cl. at 401. Instead, they projected three more months' delay with the first flight date in March 1992. By December 1990, the contractors' "confidence in the March 1992 flight date [was further] reduced." They believed that such a date was achievable "only after significant changes."

At the same time, the contractors continued operations, spending $120-150 million of their own money every month. McDonnell Douglas XIII, 76 Fed. Cl. at 427. In November 1990, the contractors submitted a formal request to the Navy to restructure the contract as a cost-reimbursement type contract. McDonnell Douglas X, 182 F.3d at 1322.

D.    The termination

The contractors' continued difficulties in performing the contract led the Department of Defense and the Navy to question the viability of the project. On Friday, December 14, 1990, then-Secretary of Defense Dick Cheney directed the Secretary of the Navy to show cause by January 4, 1991, why the A-12 program should not be terminated.

The following Monday, December 17, the Navy issued a cure notice to the contractors, stating that the government considered the contractors' performance under the contract "unsatisfactory." In particular, the cure notice stated that the contractors had "failed to fabricate parts sufficient to permit final assembly in time to meet the

schedule for delivery," and had "failed to meet specification requirements." The letter asserted that "these conditions [were] endangering performance of [the] contract," and that unless these conditions were cured by January 2, 1991, the government might terminate the contract for default.

In the following days, high-level meetings occurred between the responsible government personnel and the contractors. McDonnell Douglas X, 182 F.3d at 1323. During these meetings, the contractors asserted that they could not "get there if [they didn't] change the contract," and that it "got to get reformed to a cost type contract or [they could not] do it." When asked by the government if they could "correct deficiencies to provide an aircraft that meets the requirements," the contractors replied that "all deficiencies cannot be corrected. . . . Mother [N]ature won't allow correction of all defects. We'll do the best we can and the Navy has to decide if that's good enough."

On January 2, 1991, in responding to the cure notice, the contractors admitted that they would "not meet delivery schedules or certain specifications of the original contract, or the revised FSD delivery schedule." However, they denied that they were in default because, in their view, the delivery schedules were invalid. They asserted that "the fundamental factual assumptions of the original contract, with respect to schedule and achievability of certain specification requirements, were gravely mistaken," and therefore, "the schedules and certain other specification requirements, such as weight, were impossible to satisfy." The contractors concluded that "[i]n these circumstances, there [was] not an enforceable schedule or specifications against which to measure their performance." They further declared that compliance with the government's demand to cure by January 2, 1991 was "unachievable."

However, the contractors stated that they were "fully committed to the success of the [A-12] Program." They again submitted their proposal to restructure the contract to a cost reimbursement contract. In exchange for that restructuring, the contractors would absorb a $1.5 billion fixed loss and would waive their claims for equitable adjustment.

On January 7, 1991, Rear Admiral William Morris, the contracting officer at the time, issued a termination letter to the contractors stating that the government was terminating the A-12 contract due to the contractors' default. A few weeks later, the Navy sent a letter to the contractors demanding the return of approximately $1.35 billion in unliquidated progress payments under the terminated contract. McDonnell Douglas X, 182 F.3d at 1324.

## II. LITIGATION HISTORY

### A. The first round

In June 1991, the contractors sought relief in the Court of Federal Claims under the Contract Disputes Act, 41 U.S.C. § 609(a), requesting that the court: (1) grant the contractors' equitable adjustment claims, (2) convert the government's termination for default into a termination for convenience, (3) deny the government's demand for return of progress payments, (4) award the contractors costs and a reasonable profit under the contract, (5) award the contractors settlement expenses, and (6) award damages for breach of contract.

After several years of litigation, the Court of Federal Claims ruled that the government's default termination was invalid. McDonnell Douglas Corp. v. United States, 35 Fed. Cl. 358, 368-71 (1996) ("McDonnell Douglas IV"). It found that the

contracting officer failed to exercise "reasoned discretion" before the default termination because Secretary Cheney's actions effectively forced the Navy to terminate the A-12 contract for default. Id. at 369-71. Therefore, it vacated the government's termination for default and converted it into a termination for convenience. Id. at 361. The court ultimately denied the government's claim for return of $1.35 billion in unliquidated progress payments, and entered judgment of approximately $1.2 billion in favor of the contractors. McDonnell Douglas Corp. v. United States, 40 Fed. Cl. 529, 555-56 (1996) ("McDonnell Douglas IX").

On appeal, we reversed, holding that because the termination for default was related to the contractors' performance, it was within the discretion of the government. McDonnell Douglas X, 182 F.3d at 1321. We remanded the case for the trial court to determine whether the default termination was justified. Id.

B.    The second round

After a six-week trial on remand, the Court of Federal Claims ruled in favor of the government. McDonnell Douglas XI, 50 Fed. Cl. at 319. The court sustained the default termination based solely on the contractors' failure to meet the December 1991 first flight date. Id. at 315-19. It declined to base its determination of justified default on the contractors' alleged financial inability to perform the contract, anticipatory repudiation, and failure to comply with weight and other specification requirements. Id. at 319-24. The court also rejected the contractors' arguments that the unilateral schedule was unreasonable and therefore unenforceable, or, if enforceable then the Navy waived the unilateral schedule and first flight date of December 1991; that the contract was commercially impossible to perform; and that the Navy had to disclose its

alleged superior knowledge despite the assertion of the state secrets privilege. Id. at 324-26. The court then entered judgment in favor of the government. Id. at 326.

On appeal, we affirmed the trial court's determination that the unilateral schedule imposed by the government was enforceable and not waived, that the Military and State Secrets privilege precluded litigation of the contractors' "superior knowledge" claim, and that the government's claim for progress payments was not at issue in the case. McDonnell Douglas XII, 323 F.3d at 1018-24. However, we held that the trial court misapplied the controlling standard in determining whether the default termination was justified. Id. at 1012-14. Therefore, we again vacated and remanded. Id.

Specifically, we stated that a default termination did not require "absolute impossibility of performance or a contractor's complete repudiation or abandonment." Id. at 1015. On the other hand, the government cannot justify a default termination "based solely on a contractor's concerns about meeting a contractual schedule milestone or specification requirements." Id. Instead, the government must establish by a preponderance of the evidence of a "reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance." Id. at 1016. (citing Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987)).

C.    The third round

On remand, the Court of Federal Claims stated as follows:

> The case turns on whether the Circuit's remand meant for the clauses, "entire contract effort" and "contract completion date" to mean exactly what they appear to mean—the contractors' expansive view; or whether the remand permits our use of a more compact yardstick—coinciding with the Government's restricted view. The Government did not

> establish a contract closing date and the contracting officer
> did not conduct a <u>Lisbon</u> analysis prior to termination.

<u>McDonnell Douglas XIII</u>, 76 Fed. Cl. at 437 n.92. The court concluded that the government could not "prevail if the law require[d] an enforceable contract completion date at termination," but went on to state that the government's "burden of proof [did] not necessarily require the Government to provide a completion date for the entire contract effort." <u>Id.</u> at 388.

Based on its understanding that we "implied in this case that a court may choose a reasonable period of performance to use as a measure of progress on the contract," <u>id.</u> at 420, the court found that the Navy's unilateral modification, P00046, was a yardstick that "enable[d] the court to consider the contractors' progress in light of factors that are probative of their ability and willingness to perform," <u>id.</u> at 389. Using P00046 as the yardstick and considering "all of the relevant facts and testimony," <u>id.</u> at 421, including mitigating factors for the contractors, the court concluded that the overall evidence of record supported a conclusion that the government was justified in terminating the contract for failure to make progress, <u>id.</u> at 430.

In addition, the trial court stated that the judgment in the case mooted the government's alternative argument that the contractors did not provide adequate assurances to the contracting officer after receiving the notice to cure. <u>Id.</u> at 434.

The contractors timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## III.  DISCUSSION

A.  Standard of review

Whether the government is justified in terminating a contract for default is a question of law based on factual underpinnings.  McDonnell Douglas X, 182 F.3d at 1325.  We review issues of law de novo, without deference to the trial court.  McDonnell Douglas XII, 323 F.3d at 1012 (citation omitted).  However, we will not disturb the trial court's factual findings, such as its evaluation of evidence of default, unless they are clearly erroneous.  Id.

B.  Analysis

1.  Termination for failure to make progress in the absence of a contract completion date

In McDonnell Douglas XII, we quoted the language from Lisbon in toto and directed the Court of Federal Claims to determine "the performance required by the contract[1] and the contract completion date."  323 F.3d at 1018 (emphasis added, footnote added).  We acknowledge that this specific instruction, if read literally, turns out to be difficult to apply.  This is largely due to the unique facts of this case and the disadvantage we faced last time when deciding the case without the benefit of sufficient fact findings from the trial court.  See id. at 1014.

---

[1]    Generally, obligations arising from the exercise of an option are part of a new contract only when the option was the principal subject matter of the bargain, i.e., an option contract.  Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1275 (Fed. Cir. 1999) (citing 3 Eric Mills Holmes, Corbin on Contracts § 11.1 (1996)).  In this case, because the option to purchase Lot I production aircraft is not the principal subject matter of the original bargain, it is properly considered as part of the original A-12 contract between the contractors and the government.  Thus, "the performance required by the contract" includes the design, manufacturing, and testing of the eight prototype planes under the FSD contract, the manufacturing and testing of the six Lot I production aircraft, and other testing and supporting of the project.

2007-5111, 5131                     11

The difficulty in strictly applying the Lisbon test lies in the critical fact that P00046 revised the prototype aircraft delivery dates but left Lot I delivery dates unchanged. As such, there is an overlap between the modified delivery schedule for the eight prototype aircraft and the original delivery schedule for the Lot I production aircraft. See Delivery Schedules, supra. The government insists that the Lot I schedule remains in effect because that portion of the original contract was not modified by P00046. However, "[t]he A-12 contract was designed as a long-term research and development effort, structured so that each period of performance built upon preceding work." McDonnell Douglas XIII, 76 Fed. Cl. at 432. Because the eighth test plane would serve as the prototype for the Lot I aircraft, the contractors could not have delivered Lot I aircraft according to the original schedule as that would require delivering the production aircraft prior to the prototype planes. Therefore, we agree with the Court of Federal Claims that the "[a]pplication of the contract in [the] manner [advocated by the government] would be nonsensical." McDonnell Douglas XIII, 76 Fed. Cl. at 432. It follows that the contract, as modified by P00046, does not provide a definite contract completion date.[2] Id. at 401.

The contractors would have us apply the Lisbon test literally and hold that the absence of a contract completion date per se precludes the government from ever justifiably terminating a contract for failure to make progress. We cannot adopt such a broad categorical rule. The propriety of such a default termination, even though

---

[2] The contractors offered legal principles, such as judicial estoppel and waiver, to support this point. We do not believe it is necessary to reach those arguments. Whether the contract has a completion date is a question of fact. Common sense in this case dictates the conclusion that "[t]he overlapping schedule offered by the Government as a basis for assessing default is unreasonable and likely unenforceable." McDonnell Douglas XIII, 76 Fed. Cl. at 432.

ultimately a question of law, is a fact-sensitive inquiry. The <u>Lisbon</u> test requires the contracting officer's <u>reasonable</u> belief that there was no <u>reasonable</u> likelihood of timely completion. <u>Lisbon</u>, 828 F.2d at 765. Therefore, it is inevitable that some case-by-case adjudication is required.

To be sure, just as the prior panel did, we reaffirm that the test formulated in <u>Lisbon</u> is a correct standard for determining whether a default termination for failure to make progress is justified. However, this test was announced in view of the specific facts presented in that case, where there was a definite contract completion date. <u>Lisbon</u>, 828 F.2d at 761, 762. It did not address the situation where, as in the present case, the contract does not specify a fixed completion date. <u>See</u> <u>United States v. Alaska S.S. Co.</u>, 253 U.S. 113, 116 (1920) (stating that a court "will determine only actual matters in controversy essential to the decision of the particular case before it," and that it "is not empowered to decide . . . abstract propositions . . . which cannot affect the result as to the thing in issue in the case before it"). As such, the <u>Lisbon</u> standard could not be literally applied in every default termination for failure to make progress case.

We are confident that <u>Lisbon</u> does not, as the contractors argue, foreclose a court's review of a default termination for failure to make progress merely because of an unascertainable contract completion date. This is evident from <u>Lisbon</u> itself, in which the court approved the Claims Court's citation and interpretation of <u>Universal Fiberglass Corp. v. United States</u>, 537 F.2d 393, 397 (Ct. Cl. 1976).[3] <u>Lisbon</u>, 828 F.2d at 765.

---

[3]     <u>Universal Fiberglass</u> was also cited with approval by the previous two panels in deciding the present case. <u>See</u> <u>McDonnell Douglas X</u>, 182 F.3d at 1328; <u>McDonnell Douglas XII</u>, 323 F.3d at 1015.

Universal Fiberglass involved a supply and service contract for more than 12,000 mail delivery trucks. 537 F.2d at 394. The contractor in that case repeatedly failed to meet the installment delivery schedule, even after several extensions of time. Id. at 394-95. It closed down almost all of the production lines and laid off most of its labor force. Id. at 395. Meanwhile, a government audit showed that the contractor was insolvent. Id. Time and again, the government asked the contractor to furnish its proposed revised delivery schedule, but to no avail. Id. The government issued a Preliminary Notice of Default and gave the contractor ten days to cure all of its defaults. Id. at 396. After the contractors waived its rights to the full ten-day notice period, the government promptly terminated the contract for failure to make progress. Id.

The Court of Claims held that the contract was properly terminated for failure to make progress. Id. The court found that in the absence of a delivery schedule, i.e., the contract completion date, the "cure notice" served the purpose of advising the contractor when the time for default has been reached. Id. at 398. The court reasoned:

> The contractor had already been asked to submit a new delivery schedule and had not done so. Nor had the contracting officer learned, from the contractor or any other source, any information to lead him to believe that deliveries would or could ever be resumed. In such circumstances, a unilateral delivery schedule prescribed by him would have been an exercise in futility, except for forensic purposes, should we be so foolish as to give the absence of such a schedule any legal significance or weight.

Id.

We realize that the facts in Universal Fiberglass are not exactly the same as in the present case. First, the difficulties in designing and manufacturing stealth aircraft are incomparable to those in making small three-wheeled mail delivery trucks. More

importantly, as the contractors correctly point out, in <u>Universal Fiberglass</u>, the contractor "was making no progress at all, had never manufactured a vehicle under the new specifications it had agreed to, did not have the necessary parts and could not obtain them and had allowed its labor force to wither away." <u>Id.</u> at 398. In contrast, in the present case, "[d]espite delays, the contractors continued operations. They were spending $120 to $150 million of their own money every month. They were committed to performing the A-12 contract until the date of termination." <u>McDonnell Douglas XIII</u>, 76 Fed. Cl. at 427.

However, the contractors' commitment to performing the contract was not without conditions. Starting from as early as June 1990, the contractors had asserted that "the A-12 contractual schedule [was] not achievable and need[ed] to be changed." They also predicted that the cost of completing the contract would exceed the ceiling price so substantially that it would be "unacceptable" to the contractors. Insisting that the A-12 project could not "be accomplished under a fixed price type contract without [solving] the financial, schedule and specification problems," the contractors proposed that the contract be modified. The contractors maintained this position throughout their performance of the A-12 contract.

After missing the original first flight date, "[t]he contractors were working to an aggressive schedule, but they would not sign up for one." <u>McDonnell Douglas XIII</u>, 76 Fed. Cl. at 399. Because the contractors rejected the government's proposal of a bilateral modification of the contract, the government imposed the unilateral modification of the delivery schedule for the prototype airplanes, P00046, "as a first step in achieving the overall delivery schedule." <u>McDonnell Douglas XIII</u>, 76 Fed. Cl. at 400.

P00046 extended the first flight date from June 1990 to December 1991. The contractors' projected delivery date, however, further slipped away. "Six months prior to termination, the contractors projected a twelve to fourteen-month delay in first flight [June – August 1991]. By termination, the contractors' expectations extended first flight to March 1992." McDonnell Douglas XIII, 76 Fed. Cl. at 422. In fact, by December 1990, the contractors' confidence in even the March 1992 flight date was reduced. They believed that such a date was achievable "only after significant changes." As the trial court found, "Navy officials . . . could not predict when the contractors would deliver first flight." McDonnell Douglas XIII, 76 Fed. Cl. at 401.

As the contractors themselves emphasize, "one cannot test an aircraft before it has been built, nor build a production airplane before developing its prototype." Therefore, without the timely delivery of the prototype airplanes, there would be no basis for the government to prescribe a new delivery schedule for Lot I aircraft. In this sense, similar to the Court of Claim's opinion in Universal Fiberglass, we believe requiring the contracting officer to artificially reset the contract completion date would have been "supererogatory," "except for forensic purposes." See Universal Fiberglass, 210 Ct. Cl. at 217. Therefore, we agree with the trial court that this case is similar to Universal Fiberglass in that

> a schedule is not necessary because the cure notice supplants the schedule and serves a similar function. The cure notice lets a contractor know that even if performance or delivery is not yet due, the contracting officer believes the contractor may not be making sufficient progress to complete the contract on time. The burden is then on the contractor to advise the Government how it will complete the project on time, according to contract requirements.

Id. at 419.

One could analogize the per se rule advocated by the contractors to an injunction against the government.   In granting or denying an injunction, a court follows traditional equitable principles and "balances the conveniences of the parties and possible injuries to them" to arrive at a "nice adjustment and reconciliation" between the competing claims.   Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).   When a government contract is terminated, there are two interests at issue—the contractor's interest in holding the government to its obligation to carry out the contract, and the government's interest in not wasting taxpayer dollars.   The contractors in this case, however, would have us enjoin the government from ever terminating a contract for failure to make progress based on a single factor—the contract lacks a set completion date.   We reject such a per se rule because it serves only the contractors' interest.   Instead, we favor an ad hoc, factual inquiry that allows careful examination and weighing of all relevant circumstances.   See McDonnell Douglas XII, 323 F.3d at 1014 (stating that "[i]n determining whether a default termination was justified, a court must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues").

In fact, in our 2003 opinion, we provided the same guidance, stating that to determine whether a default termination is justified, "the trial court should focus on the events, actions, and communications leading to the default decision in ascertaining whether the contracting officer had a reasonable belief that there was no reasonable likelihood of timely completion." McDonnell Douglas XII, 323 F.3d at 1017.   Of course, in some cases, it is possible that a conclusion drawn from a comparison of the entire contract effort and the time remaining for contract performance is so clear that it

becomes dispositive. See Lisbon, 828 F.2d at 765. However, in cases such as the present one, where such a comparison is inapplicable, the court must examine other factors, including the contractor's failure to meet progress milestones, its problems with subcontractors and suppliers, its financial situation, and its performance history. See McDonnell Douglas XII, 323 F.3d at 1017. Only after analyzing the totality of the circumstances can a court determine whether a contractor failed to "[p]rosecute the work so as to endanger performance" of the contract. See 48 C.F.R. § 52.249-9.

### 2. Default termination of the A-12 contract

It is true that the A-12 contract, as modified by P00046, lacks a definite contract completion date. However, this single factor, even though important, is insufficient to support the contractors' contention that the government cannot sustain the default termination. A court must also take into account other relevant facts and testimony in deciding whether the default termination was justified.

In Lisbon, we held that the government bears the burden of justifying the propriety of a default termination. 828 F.2d at 765. We also stated that "the contracting officer's termination decision [must] be based on tangible, direct evidence reflecting the impairment of timely completion." McDonnell Douglas XII, 323 F.3d at 1016 (citing Lisbon, 828 F.2d at 766). The direct evidence includes the contractors' "statements that they could not meet the contract specifications, the contract delivery schedule, nor complete performance at the specified contract price." Id. at 1013 (quoting McDonnell Douglas X, 182 F.3d at 1332). The direct evidence also includes the "contracting officer's testimony and contemporaneous documents." Id. at 1016. The Court of Federal Claims made detailed factual findings based on the evidence. McDonnell

Douglas XIII, 76 Fed. Cl. at 422-30.  After reviewing the record, we see no clear error.  Therefore, we only highlight a few important aspects here.

a.      Contractors' performance history and failure to meet progress milestones

The contractors missed several milestones under the original contract, the most significant of which, of course, is the June 1990 first flight date.  They also missed the July 1990 delivery date for the second prototype airplane.  More tellingly, after the government unilaterally modified the contract through P00046, and in fact, in their response to the cure notice, the contractors unequivocally stated that they would not meet the revised delivery schedule for the eight prototype airplanes.  Instead, they projected that the first flight date would be in March 1992, three months after the date imposed in P00046.  By December 1990, the contractors were only "50%" confident in this date, believing it was achievable "only after significant changes."

The contractors and the amicus curiae argue that if we uphold the default termination here, the government may terminate for failure to make progress a contract for any minor slippage in meeting any insignificant interim milestone.  This is an exaggeration.  First of all, due to the sequential "building block" structure of the A-12 contract, delivery of the prototype airplanes is not just any milestone.  It is certainly not an insignificant milestone.  Quite to the contrary, it is clearly one of the most important milestones in the entire contract.  This is because, as the contractors admit, "one cannot test an aircraft before it has been built, nor build a production airplane before developing its prototype."

Second, the delay in the delivery schedule is hardly just a minor slippage.  The A-12 contract provided the June 1990 first flight date.  In other words, it provided the

contractors thirty months from the contract award time (January 1988) to deliver the first prototype plane. P00046, in extending the first flight date to December 1991, gave the contractors 60 percent more time to reach this significant milestone. Yet, the contractors, even though at first predicting that they would, concluded that they could not meet this schedule. In fact, they were not even sure if they could deliver in March 1992. According to the contractors' own estimate, even assuming they could meet the March 1992 first flight date, they would not complete the design, manufacturing, and testing of the aircraft until July 1995, two years and three months after the April 1993 TCHEVAL deadline specified in the original contract.

More importantly, we are not upholding the default termination "based solely on a contractor's concerns about meeting a contractual schedule milestone." McDonnell Douglas XII, 323 F.3d at 1015 (citing Lisbon, 828 F.2d at 765). As we explained above, the contractors' failure to meet progress milestones is one factor to be considered in the totality-of-the-circumstances analysis. In this respect, we agree with the trial court that

> [m]issed milestones "indicate a pattern of nonperformance and delay which should not be ignored. Although not justifications for default in themselves, they provide a context for understanding and evaluating plaintiff's continued problems." Such information should be relevant if we consider whether a reasonable contracting officer might reasonably have been concerned about [the contractors'] ability to complete the contract on time.

McDonnell Douglas XIII, 76 Fed. Cl. at 426 (quoting Universal Fiberglass, 537 F.2d at 397).

b.     Contractors' financial situation

Another piece of relevant information we consider when reviewing a default termination is the contractors' financial situation. "The cost to complete a contract—

more particularly, the inability of a contractor to perform a contract at the specified contract price . . . [is a] fundamental element[] of government contracts and [is] related to contract performance; as such, [it is] highly relevant to the question of default." McDonnell Douglas X, 182 F.3d at 1328.

The A-12 contract as initially awarded had a target contract price of $ 4,379,219,436 and a ceiling price of $ 4,777,330,294. In June 1990, the contractors proposed that the fixed-price contract be modified because the cost of completing the contract would exceed the ceiling price so substantially that it would be "unacceptable" to the contractors.

The contractors repeatedly insisted on restructuring the contract from a fixed-price contract to a cost-reimbursement type contract. Even during the high-level negotiation meetings following the government's issuance of the cure notice, Mr. John McDonnell, the CEO of MDC, asserted that the contractors "can't get there if we don't change the contract," and that the contract "has got to get reformed to a cost type contract or we cannot do it." In their January 2, 1991, written response to the cure notice, the contractors again submitted their proposal to restructure the contract to a cost reimbursement contract. In exchange for that restructuring, the contractors would absorb a $1.5 billion fixed loss and would waive their claims for equitable adjustment. The sizeable concession the contractors were willing to make further illustrates the grave inadequacy of the contract price.

Of course, the difficulty in the contractors' financial situation, in and of itself, may not be sufficient to justify the default termination. See McDonnell Douglas XI, 50 Fed. Cl. at 320-21 (ruling that the contractors' financial condition "was not endangering

performance of the A-12 contract"). However, in this case, "inadequate financing is not collateral [because] it pervades the entire contract." Universal Fiberglass, 210 Ct. Cl. at 216. Indeed, in the months leading to the termination, the contractors were spending $120-150 million of their own money every month. McDonnell Douglas XIII, 76 Fed. Cl. at 427. Captain Lawrence Elberfeld, the Navy's A-12 Program Manager, testified that the cost to complete the A-12 contract would be so "unthinkably" over the fixed-price ceiling that the contractors' internal "worst case estimate could bankrupt both corporations." Id. at 429.

More importantly, Captain Elberfeld testified that the cost overruns jeopardized the contractors' performance because the contractor engaged in "cost cutting efforts like reducing staff, eliminating overtime, quick fixes that address and would remedy a cash flow situation." Id. at 428. For example, around the time when the contractors missed the original first flight date, they removed 110 people from the A-12 program. Id. Captain Elberfeld concluded that the contractors' cost cutting efforts to avoid bankruptcy led to "more corner-cutting and more incomplete effort and basically a longer process to get a product that may not be the product that we desire or need for the Navy." Id. at 429.

   c.   Conclusion

In summary, the government offered the contracting officer's testimony, the contractors' statements, and contemporary documents as direct evidence. The evidence, such as the contractors' performance history (e.g., the failure to meet several milestones, including the significant first flight), coupled with the contractors' dire financial difficulty, which negatively impacted their performance under the contract,

shows that the contracting officer was reasonably justified in feeling insecure about the contractors' rate of progress. Therefore, the government has satisfied its burden to justify the default termination.[4]

Once the government has met this burden of proving that timely performance is beyond the contractors' reach, the contractors have the burden of going forward to prove either that they were making progress such that timely completion of the contract was not endangered or that there was excusable delay. See Appeal of Mich. Joint Sealing, Inc., ASBCA No. 41477, 93-3 BCA 26,011 (Apr. 26, 1993). On appeal, the contractors assert no affirmative defense. They proffer no record evidence to show, without contract restructuring, that they could have completed the contract on any date. Certain arguments, such as waiver, are presented to support their proposition that, at termination, the A-12 contract lacked an enforceable completion date. Even if these arguments could be interpreted as the contractors' defenses, we have already addressed them elsewhere in this opinion. In conclusion, because the government was justifiably insecure about the contract's timely completion and the contractors do not argue that their failure to make progress could be excused, we sustain the default termination of the A-12 contract.

3.    Default termination without contracting officer's Lisbon analysis

The contractors and the amicus curiae also assert that we cannot uphold the default termination because the contracting officer, Admiral Morris, did not conduct the

---

[4]    Our current analysis may appear different from the one we previously instructed the trial court to perform, specifically, to determine the contract completion date. See McDonnell Douglas XII, 323 F.3d at 1018. We believe that this is warranted as under the law of the case doctrine, "it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." Arizona v. California, 460 U.S. 605, 619 (U.S. 1983).

<u>Lisbon</u> analysis before the termination. They base this argument on the trial court's finding that "Admiral Morris did not determine the entire effort required and the time left to complete that contract effort prior to termination." <u>McDonnell Douglas XIII</u>, 76 Fed. Cl. at 424 n.72; <u>see also</u> <u>id.</u> at 437 n.92 (concluding "the contracting officer did not conduct a <u>Lisbon</u> analysis prior to termination"). This argument is unpersuasive.

First of all, as we have stated earlier, because the modified A-12 contract does not contain a fixed completion date, a <u>Lisbon</u> analysis cannot be strictly applied. Second, we previously stated that "the government is not required to establish that the contracting officer conducted the analysis necessary to sustain a default under the alternative theory." <u>Empire Energy Mgmt. Sys. v. Roche</u>, 362 F.3d 1343, 1357 (Fed. Cir. 2004); <u>see also</u> <u>Christopher Vill., L.P. v. United States</u>, 360 F.3d 1319, 1337 (Fed. Cir. 2004) ("This court sustains a default termination if justified by circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason." (quoting <u>Kelso v. Kirk Bros. Mech. Contractors, Inc.</u>, 16 F.3d 1173, 1175 (Fed. Cir. 1994))).

The contractors and the <u>amicus</u> <u>curiae</u> attempt to distinguish the present case from <u>Empire Energy</u>. The <u>amicus</u> <u>curiae</u> emphasizes that there is a "critical distinction between failure to make progress as the asserted basis for default at the time of termination, and failure to make progress as an alternative basis for default, proven at trial, that supports an otherwise unsustainable termination for failure to timely deliver." We discern no such distinction. In fact, the <u>amicus</u>'s contention is illogical—it would have us, on the one hand, uphold a default termination for failure to make progress when the contracting officer never even contemplated, much less evaluated, such a

basis; while at the same time, reject another default termination for failure to make progress even though the contracting officer explicitly asserted such a basis.

More importantly, we are less concerned about the label of the contracting officer's action so long as, in fulfilling his duty, the contracting officer exercised reasoned judgment and did not act arbitrarily. After reviewing the record, we believe that the contractors are not victims of arbitrary government action. Admiral Morris testified that concerns about the A-12 Program "increased [and] the risks increased" in the fall of 1990. Id. at 424 n.70. The trial court found that

> [a]s the end of 1990 approached, [Admiral Morris] was concerned that substantial development on the aircraft had yet to occur. He testified "[t]he contractors were indicating that they were experiencing an overrun that they could not absorb. Cost was obviously a factor and their failure to fabricate components, their failure to meet schedule were clearly impacting cost."

Id. at 423-24.

Admiral Morris also testified that in the weeks leading to termination, the contractors "indicated that they would not be able to meet the delivery schedule that was currently in the contract. And they would not be able to perform the contract without extraordinary relief or additional funding for the contract." Id. at 424 (alterations omitted). He explained: "I didn't know at that particular time when in fact they would be able, if ever, to achieve performance of the contract and I was hearing 'we will not' or 'we could not.'" Id. (alterations omitted).

On December 17, 1990, Admiral Morris issued a cure notice, warning the contractors that their performance was "unsatisfactory" and the defect conditions were "endangering performance" of the contract. He explained that "[t]he purpose of the cure

notice was to advise the contractors they were failing to make progress." <u>McDonnell Douglas XIII</u>, 76 Fed. Cl. at 402. He testified that he "had been extremely concerned with the communications coming in from the contractors that unless extraordinary relief were provided, unless the contract were restructured into a cost-type contract, that they could not or would not perform, and that belief existed certainly on December 17th."

Admiral Morris considered the problems of cost overruns to be a "real issue." <u>McDonnell Douglas XIII</u>, 76 Fed. Cl. at 404. Even though he made an effort to resolve the issue "within the context of the contract" without restructuring the contract, "the contractors were insisting upon Public Law 85-804 extraordinary relief."[5] Even in their January 2, 1991, written response to the cure notice, the contractors again requested restructuring the contract to a cost reimbursement contract. On Sunday, January 6, 1991, Acting Under Secretary of Defense Donald Yockey told Admiral Morris that Secretary Cheney would not provide 85-804 relief. As a result, Admiral Morris thought that

> he had three choices: to terminate the contract for convenience, to terminate the contract for default, or to do nothing. He rejected the latter as 'irresponsible,' thus focusing his attention on the other two choices. He eliminated the termination for convenience first, because he believed Contractors to be in material breach of the contract.

<u>McDonnell Douglas X</u>, 182 F.3d at 1328.

Record evidence shows that at the time of termination, Admiral Morris was justifiably insecure about the contract's timely completion. In addition, "a court's review of a default justification does not turn on the contracting officer's subjective beliefs, but

---

[5]     Pub. L. No. 85-804, 72 Stat. 972 (1958) (codified as 50 U.S.C. § 1431), authorizes the President of the United States to grant agencies the power to provide extraordinary relief in furtherance of national defense.

rather requires an objective inquiry." <u>McDonnell Douglas XII</u>, 323 F.3d at 1016. In this regard, the facts in the record are sufficient for the court, in a <u>de novo</u> review, to sustain the default termination. <u>See</u> <u>Joseph Morton Co. v. United States</u>, 757 F.2d 1273, 1277 (Fed. Cir. 1985) ("It is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown.").

4. <u>Conclusion</u>

This is indeed an unfortunate case for all the parties involved. We realize that the court is not in a position to question the wisdom of the parties in entering this contract and subsequently, in handling problems in this case. Nevertheless, as the trial court recognized, "the Government rarely terminates fixed-price research and development contracts for default." <u>McDonnell Douglas XIII</u>, 76 Fed. Cl. at 418. We also observe that the CEOs of both MDC and GD, in a letter dated June 27, 1990, stated that "it was a mistake for the U.S. Navy to stipulate this type of contract and it was a mistake for the contractors to accept it. Both are at fault." Alas, the law of contracts does not allow us to deviate from established principles of law and equity. We therefore hold that the default termination of the A-12 contract is justified.[6] However, we emphasize that terminating a government contract for failure to make progress when the contract does not specify a completion date is the exception, not the norm. Therefore, we reiterate that the <u>Lisbon</u> test remains good law and our conclusion here is dictated by the unique facts of this case.

---

[6] The government argues that the contractors' failed to provide adequate assurance. As we hold that the default termination for failure to make progress is justified, we do not need to reach this argument.

IV.    CONCLUSION

For these reasons, the judgment of the Court of Federal Claims is affirmed.

COSTS

Each party shall bear its own costs.

<u>AFFIRMED</u>